FRANK FOUNDRIES CORPORATION *v.* REVIEW BOARD,
INDIANA EMPLOYMENT SECURITY
DIVISION ET AL.

[No. 17,883. Filed October 21, 1949. Rehearing denied November 21, 1949. Transfer denied January 11, 1950.]

694

*Oakleaf & Churchill,* of Moline, Illinois; *Bracken, Gray, DeFur & Voran,* of Muncie, for appellant.

*J. Emmett McManamon,* Attorney General, *James A. Watson,* Deputy Attorney General, *Glen F. Cline,* Chief Counsel, Emp. Sec. Div.; and *George S. Koons* and *Earl G. Manor,* both of Muncie, for appellees.

ROYSE, J.—This case involves the construction of § 1504 of the Indiana Employment Security Act, Burns' 1933 (1947 Supp.), § 52-1539c. The pertinent portion of this section is as follows:

> "An individual shall be ineligible for waiting period or benefit rights: For any week with respect to which the board finds that his total or partial or part-total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which

he was last employed; Provided, That this section shall not apply if it is shown to the satisfaction of the board that: He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; and he has not voluntarily stopped working, other than at the direction of his employer, in sympathy with employees in some other establishment or factory in which a labor dispute is in progress; . . ."

At all times referred to herein the appellant was the employer of the individual appellees. (Hereinafter, the appellant will be referred to as the employer, the individual appellees as the employees, and the appellee The Review Board of the Indiana Employment Security Division as the Board.) The facts out of which this controversy arose may be summarized as follows:

The employer operates an iron foundry employing about one hundred fifty people. A collective bargaining agreement had been entered into between the employer and Local Union 242—U.A.W.-C.I.O.—as agent for the employees. For several months prior to May 27, 1948, because of a shortage of materials, the employer's plant worked only an average of about three days a week. Among the employees were Joe Kendrick and Elbert Hibbard who ground gates off the castings. On the standard fixed for this work, for several days prior to May 25, 1948, these men had earned from $1.50 to $1.97 per hour. The base rate for this work was $1.01 per hour and required making 60 units per hour. On May 26th the employer's assistant superintendent and their foreman observed these men were idling on the job. On the morning of May 27th, at a meeting of the

employer's foremen, the time tickets of these two employees disclosed they had made only 36 or 37 units per hour. Their foreman was instructed to discharge them, which he did about 9 A. M., May 27th. The discharged employees went through the plant telling the other employees they had been fired. One John Higgins, an employee who is Chairman of the Union Bargaining Committee, demanded an immediate meeting with the plant manager. He rounded up his committee and most of the other employees, and they met with the plant manager and other representatives of the employer. They demanded the immediate reinstatement of the discharged employees. The plant manager refused and told them to take the regular procedure for a grievance and asked them to go back to work. This meeting was held about 10 A. M.

Section 1.A. of Article III, of the Bargaining Agreement between the employer and employee, provides as follows:

> "Any employee or group of employees having a grievance or complaint shall not participate or cause any work stoppage or slow down."

The men did not return to work. Shortly before 11 A. M. another meeting was held. At this meeting the plant manager told them that unless they returned to work by 11 A. M. the metal in the cupola would freeze over and the bottom would have to be dropped. They refused to return to work unless the two discharged employees were put back to work. At 11:03 the plant manager gave the orders to pull the bottom of the cupola. This was done and the foundry closed down. It has not since reopened. It is undisputed that at the time the employees quit work the employer had sufficient material to furnish employment for at least May

27th and 28th. The record discloses that on the morning of May 27th, about 8 A. M., and prior to the discharge of the two employees, orders were issued to lay off the core room employees at 9 A. M. This order was cancelled when the superintendent learned another car of pig iron was enroute to the plant. On June 1st the employer had sufficient material for a week's work.

Subsequently, about June 8th, at a meeting between the employer and a committee representing the employees, the latter again demanded the re-instatement of the discharged employees. This was again refused by the employer. The employees filed their respective applications for benefits under the Act.

In due course the claims were heard by a Referee who made the following findings and conclusions:

"The Referee finds that a controversy existed between the employer and the union representing the production employees of this employer, concerning the reinstatement of two workers, who had been discharged by the employer on May 27, 1948. This controversy involved working conditions of the employees, and thus constituted a labor dispute, within the meaning of the Indiana Employment Security Act. A stoppage of work began at the Muncie plant of the employer at about 11 o'clock on the morning of May 27, 1948. At the time the plant was shut down on the last mentioned date, the employer had but one day's supply of pig iron on hand, and the supply of other materials necessary for continued operation was extremely limited. The aforesaid stoppage of work was not caused by the labor dispute, but resulted from a lack of available work for the employees at the employer's plant. While the strained labor relations of the employer may have been a contributing factor in the plant shut-down, the effective cause of the stoppage was the shortage of materials necessary for continued operations. Neither of the two discharged workers were parties to this action, and no finding is made as to their eligibility for benefits.

"DECISION: If otherwise eligible, the claimants herein are entitled to waiting period and benefit rights after May 27, 1948."

Subsequently the employer filed a request for appeal to the Board and application for leave to introduce additional evidence. A hearing was held before the Board and the employer offered additional evidence, some of which was received and some refused. A majority of the Board, one member dissenting, affirmed the award of the referee.

The principal question before us is: Is there any substantial evidence to support the finding that the work stoppage on May 27th was caused by a shortage of material and not by the labor dispute?

We recognize but do not deem it necessary to cite authority to support the firmly established rule that if there is any substantial evidence to support the award of the Board it must be affirmed.

The precise question presented here has not heretofore been presented to this court. Insofar as we have been able to ascertain the only appellate tribunal which has passed on it is the Supreme Court of Utah. That was in the case of *Employees of Utah Fuel Co.* v. *Industrial Commission* (1940), 99 Utah 88, 104 P. 2d 197. Before considering that case we deem it expedient to briefly reiterate the purpose and intent of the Indiana Employment Security Act.

The purpose of the Act is to provide benefits for those who are *involuntarily* out of employment. In other words, it is intended to benefit those who are out of employment because the employer is unable, for reasons beyond the employees' control, to provide work, or the proffered work endangers the health, safety and morals of the employee, or the working conditions or wages are below the standards

prevailing in the community for the same type of work. It is not intended to finance those who are willingly refusing to work, when work is available, because of a labor dispute. *Walter Bledsoe Coal Co. et al.* v. *Review Board* (1943), 221 Ind. 16, 21, 46 N. E. 2d 477; *White* v. *Review Board of Indiana Employment Security Division* (1944), 114 Ind. App. 383, 52 N. E. 2d 500. See also: *In Re Sadowski* (1939), 257 App. Div. 529, 13 N.Y.S. 553; *Department of Industrial Relations* v. *Pesnell* (1940), 29 Ala. App. 528, 199 So. 720, writ of certiorari denied (1941), 313 U. S. 590, 61 S. Ct. 1113; and notes 135 A.L.R. 922, 927.

It is undisputed in the record and the Referee and Board found that at the time there was a labor dispute between the employer and the employees. As heretofore indicated, the important question here is: Did that labor dispute cause the work stoppage?

In the case of *Employees of Utah Fuel Co.* v. *Industrial Commission, supra,* the facts as stated in the opinion were as follows:

"Petitioners are 'contract' miners working for the Utah Fuel Company in its Clear Creek coal mine. They are all members of the United Mine Workers of America Labor Union. Prior to March 31, 1939, petitioners and the Utah Fuel Company were parties to an agreement between the Union and the Utah coal operators, which agreement set out hours of work, wage scale, conditions of employment, etc. Said agreement, which obtained throughout the United States, expired on March 31, 1939. As that date approached the national officers of the Union and coal operators in the Central Competitive Area entered negotiations for a new contract. By March 31st no agreement had been reached so the Utah coal operators and the local U.M.W. Union for district No. 22 entered into an extension agreement which provided that they were to continue indefinitely under the terms of the old contract, but either party had the right to

terminate the extension agreement on fifteen days'
notice. On April 19, 1939, the Union notified the
Utah coal operators that the extension agreement
would be terminated and that mining operations
would stop at midnight on May 4, 1939.

"The night shift at the Clear Creek mine nor-
mally worked from 7 p.m. until 2 a.m. On the
night of May 3rd, the night shift was told not to
report on May 4, 1939. Mining operations in the
Clear Creek mine were suspended beginning at
the end of the day shift on May 4, 1939. On May
11th, an agreement was reached by the Union and
the operators in the Central Competitive Area and
District No. 22 of the Union *was* notified. The Utah
Union immediately submitted the new agreement
to the Utah coal operators for approval, which
approval was given by the operators on May 18,
1939.

"Petitioners point out that the night shift was
told not to come to work on May 4. But testimony
was offered that the night shift merely loads and
does not dump its coal. The Utah Fuel Company
points out that it did not want coal standing in its
mine and that no workmen would be present to
dump the coal on May 5th."

In affirming the order of the Industrial Commission
denying benefits, the court said, in part:

"The fact that a 'work sign' was not posted at
the mine—a customary procedure on the days when
the mine was to operate—or that petitioners were
not requested to work from May 4th to 18th does
not show that the stoppage was not due to a strike.
The Utah Fuel Company's mine was unionized.
The management dealt with the elected Union offi-
cials. When notified by them that work would stop
at midnight May 4th, it apparently relied on that
statement. Surely an employer is justified in rely-
ing on a notice affecting his union employees given
by an authorized union official. . . .

"Petitioners assert that the Utah Fuel Com-
pany started to repair its tipple and do other con-
struction work during this period in question and
that the portion of the mine wherein work was

being prosecuted was practically worked out; that therefore the company was not in a position to mine coal and did not have work for petitioners. From this they reason that stoppage was not due to a strike. *Whatever the facts be, we think them immaterial.* After the company was notified and the men left work, it matters not what the company did at its mine until the dispute was settled and the strike over. There is no evidence that the company caused the stoppage of work (other than the May 4th night shift already discussed). *The strike caused the stoppage.*

"There was a conflict on whether or not the company had orders for coal and therefore would have mined coal, had the strike not been called. This, too, is immaterial. *If workers walk out on a strike and refuse to return, except on a certain contingency, their unemployment is due to a strike regardless of any speculation or proof as to whether they would have been totally or partially unemployed had they not struck.* Petitioners talk much about the burden of proof as though an application for benefits were a suit between two adverse parties. But this and other cases under the Unemployment Compensation Act are not suits of plaintiff versus defendant. They are simply applications for benefits from a fund which the Industrial Commission is administering. It is incorrect to say that the burden of proof is on an employer in circumstances such as are here presented to show that he had work available, and that if he fails to sustain that burden benefits must be paid to striking employees." (Our emphasis.)

We approve the reasoning of the Supreme Court of Utah in that case. In our opinion the facts there were quite analogous to those in this case. When the employer herein discharged the two employees, and the Union, through its duly authorized representatives, demanded their reinstatement before the employees would resume work, there was a labor dispute. The record before us leads inescapably to the

conclusion that the stoppage of work at about 11 A. M. Thursday, May 27th, was caused solely by this labor dispute. There is uncontradicted evidence that at the time of the work stoppage there was enough material for at least a day and a half's work. Inasmuch as the plant did not work on Saturday there was sufficient material to complete that work week. Monday was a holiday. In the interim it is undisputed the employer had received enough additional material to provide work for at least an additional week. It is further shown by the record that at a meeting between the employer and the employees' Union representatives held June 8th, the employees were still demanding as a condition precedent to their return to work the reinstatement of the two discharged employees. So far as the record discloses, there was no contention at this meeting by either party that the plant could not re-open because of a shortage of material.

With certain exceptions not here material, when unemployment results from a labor dispute an employee is not entitled to the benefits provided for by the Act, so long as his unemployment is the result of such dispute.

Where unemployment is originally caused by a labor dispute, before an employee will be entitled to the benefits of the Act, he has the burden of proving that his continued unemployment is not the result of the labor dispute, but is caused by some other condition beyond his control. *Auker et al.* v. *Review Board, Indiana Employment Security Division et al.* (1947), 117 Ind. App. 486, 494, 71 N. E. 2d 629 (transfer denied) ; *Employees of Utah Fuel Co.* v. *Industrial Commission, supra.* The employees herein have wholly failed to sustain this burden.

In view of the conclusion we have reached, it is not necessary to pass on the other questions raised by the employer.

The award of the Board is reversed.

Martin, J., and Bowen, C. J.—Dissent with opinion.

## DISSENTING OPINION

MARTIN, J., AND BOWEN, C. J.—We cannot agree with the majority opinion in this case.

As recited in the majority opinion, the trier of the facts, The Review Board, found that at the time the plant was shut down, the employer had but one day's supply of pig iron on hand and that the supply of other materials necessary for the continuance of operation of the plant was extremely limited, but that the aforementioned stoppage of work was not caused by the labor dispute, but resulted from a lack of available work for the employees in the employer's plant.

The majority opinion recited other evidence of shortage of material. It seems clear to us that there was ample evidence in the record to sustain the finding of the Review Board that the shortage of materials caused the work stoppage rather than the labor dispute. There is no dispute that there was evidence of a shortage of materials. The Board after reviewing the evidence of the witnesses, concluded that this shortage of material caused the work stoppage which, in our opinion, was a reasonable inference. The majority opinion in this court, in effect, holds that the work stoppage was caused by the labor dispute, which in our opinion, amounts to a substitution of the judgment and determination of this court for that of the Review Board

on a question of fact and choice between two equally reasonable inferences.

If there is some evidence from which the ultimate facts may be reasonably inferred, the reviewing court should not disturb the findings of the Review Board although inferences other than those drawn might be reasonably warranted.

The Appellate Court should not weigh the evidence and should consider only that evidence most favorable to the decision of the Review Board. *Bimel Spoke & Wheel Co.* v. *Loper* (1917), 65 Ind. App. 479, 117 N. E. 527; *Coppes Bros. & Zook* v. *Pontius* (1921), 76 Ind. App. 298, 131 N. E. 845; *Hollingsworth Tool Works* v. *Review Board of Indiana Employment Security Division, et al.* (1949), 119 Ind. App. 191, 84 N. E. 2d 895, 896.

In the case of *Hollingsworth Tool Works* v. *Review Board of Indiana Employment Security Division, et al., supra,* this court said, "§ 1812 of the Indiana Employment Security Act, § 52-1542K, Burns' 1933 (1949 Supp.), provides that any decision of the Review Board shall be conclusive and binding as to all questions of fact. Therefore, this court will not weigh the evidence and will consider only the evidence most favorable to the decision of the Board."

We do not believe that the decision in this case can be grounded upon the *Employees of Utah Fuel Co.* v. *Industrial Commission* (1940), 99 Utah 88, 104 P. 2d 197, since in this Utah case the court affirmed an award of the Industrial Commission denying benefits. The question of fact was decided by the Review Board upon conflicting evidence, and the court affirmed such decision.

We feel it is entirely improper for this court to substitute its judgment for that of the Review Board on

a question of fact found by the Review Board which we deem to have been supported by sufficient evidence.

For the reasons given, we are of the opinion that the decision of the Review Board should be affirmed.

NOTE.—Reported in 88 N. E. 2d 160.