BLAKELY ET AL. *v.* REVIEW BOARD OF THE INDIANA
EMPLOYMENT SECURITY DIVISION ET AL.

[No. 17,944. Filed February 15, 1950. Rehearing denied
March 13, 1950. Transfer denied April 28, 1950.]

258

Bowen, J., concurs in result.

Crumpacker, J., not participating.

*Albert W. Ewbank,* of Indianapolis; and *Leon M. Despres* (of counsel), of Chicago, Ill., for appellants.

*J. Emmett McManamon,* Attorney General, *John M. Harrigan,* Deputy Attorney General; *Baker & Daniels,* of Indianapolis; *Bell, Boyd, Marshall & Lloyd; David A. Watts* and *Thomas R. McMillen* (of counsel), all of Chicago, Ill., for appellees.

ROYSE, J.—For brevity and clarity the appellants will hereinafter be referred to as the employees, appellee Review Board of the Indiana Employment Security Division as the Board, and appellee W. B. Conkey Company as the employer.

We believe a better understanding of the question presented by this appeal can be had by setting out in full the Statement of Fact and the Findings and Conclusions of the Board:

"Statement of Fact:

"The employer is a member of the Franklin Association of Chicago, an association of persons, firms and corporations engaged in the printing industry in the Chicago industrial area. Collective bargaining agreements in the industry for a number of years have been negotiated on an industry-wide basis by the scale committees of the Franklin Association, and Chicago Typographical Union No. 16, I. T. U.-A. F. of L., representing all of their membership, which includes the claimants herein.

"The employer's establishment occupies a one-story building in Hammond, Indiana, employing approximately 1,000 persons, and furnishes complete manufacturing facilities in connection with printing from the original manuscript through the bound product. The composing room employees total approximately 57. The majority of them work in a room called the composing room, and

the rest work in another room, designated as the lineup room. The employees of the two rooms are interested in the same collective bargaining unit through their membership in the Chicago Typographical Union No. 16, I. T. U.-A. F. of L., and their hours of work, rates of pay, and conditions of employment are the subject of a common collective bargaining agreement. The company has a single system of administrative superintendence, accounting and pay roll, and has a general managerial supervision of all production and clerical employees in the plant, including the composing room.

"The most recent contract prior to the period involved herein, was for one year, ending December 31, 1947. In October, 1947, negotiations were started between the scale committees of the Franklin Association and the Union with respect to a renewal agreement to be effective January 1, 1948. Negotiations continued without any agreement being reached to the date of the hearing before the Referee.

"Beginning on or about February 10, 1948, and immediately subsequent to the company's refusal to meet the demands of the local union committee that its workers be given an increase of $14.89 per week, the claimants herein, who were employees in the composing room department, engaged in work slowdown tactics, and that such tactics resulted in a decrease in production to a level of 40% of normal. Thereafter this employer complained to a Union representative concerning the slow-down tactics of the composing room department employees, and immediately subsequent to such complaint production increased to approximately 80% of normal for a day and a half, and thereafter production again returned to its previous level of 40% of normal, or three or four galleys instead of eight or ten galleys. Because of the continuance of the slowdown tactics of the claimants herein the employer caused a notice to be posted in the composing room department stating that, 'Effective Monday, March 15, 1948, and until further notice, the composing room will be closed. Notice will be given when work in the composing room is to be resumed.' Such notice was

signed, 'W. B. Conkey Company, A. A. MacDiarmid, Secretary.'

"The dollar value of the work performed by the composing room employees was approximately 10% of the dollar value of the aggregate finished product, and 90% of the volume of work performed in this employer's establishment did not go through the composing room, and of the remaining 10% of the total volume 9% of the entire finished product is worked on by the composing room department employees, and 1% of the total is performed wholly within the composing room department.

"From immediately subsequent to March 15, 1948 to the dates of the hearings before the Referee there was almost complete cessation of typesetting in the employer's establishment. However, employees normally engaged in the office or other classifications in the plant performed duties of locking up type for printing, the lining up of sheets, and the making of bases for plates previously performed by composing room employees, when necessary for emergency purposes. All other departments in this employer's establishment were functioning at normal capacity. The evidence further showed that the number of working employees subsequent to March 15, 1948 was reduced only to the extent of the number of employees in the composing room who were affected by the order of March 15, 1948.

"Work performed in the composing room is the type of work commonly done in printing establishments."

"Findings and Conclusions:

"The Review Board finds that a labor dispute existed between the employer and the claimants herein through their bargaining agent, the International Typographical Union Local No. 16 over the terms and conditions of their employment, and that such labor dispute commenced in October, 1947, and continued throughout the period herein in issue. As a result of this dispute, the claimants instituted slowdown tactics to try to force their demands upon the employer, and that the employer locked out the claimants on March 15, 1948, be-

cause of such slowdown tactics and that such lockout resulted in the claimants' unemployment after such date.

"The Review Board further finds that the claimants were employed in the employer's composing room; that as a result of such lockout, there was a substantial curtailment of production in the employer's composing room; that the employer's composing room constituted a separate branch of work, commonly carried on as a separate business in separate premises, which was conducted in a separate department of the employer's establishment, and that for the purpose of the Indiana Employment Security Act, it was in accordance with Section 1504 a separate establishment.

"The Review Board, therefore, finds that the unemployment of the claimants from March 15, 1948, to and including May 25, 1948, the last day of the hearing before the Referee, was due to a stoppage of work due to a labor dispute existing at the establishment at which they were last employed and in which they were interested and participating and because of such fact they and each of them are ineligible for their waiting period and benefit rights during any of the calendar weeks involved in the period of March 15, 1948, to and including May 25, 1948."

There is but one real question in this appeal. It is: Does § 1504—§ 52-1539c, Burns' 1933 (1949 Supp.)—of the Indiana Employment Security Act, under the facts disclosed by the record and the findings of the Board render the employees ineligible for the benefits provided by the above mentioned Act?

The pertinent provisions of this section are as follows:

"An individual shall be ineligible for waiting period or benefit rights: For any week with respect to which the board finds that his total or partial or part-total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other

premises at which he was last employed; . . . Provided, That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall, for the purpose of this section, be deemed to be a separate factory, establishment, or other premises."

The contention of the employees may be summarized as follows: First, That because this act is liberally construed to achieve its beneficent purpose an otherwise qualified unemployed claimant is entitled to its benefits unless he is clearly covered by a disqualifying provision of the Act. Second, That before a claimant becomes ineligible under the above quoted section of the statute there must be a stoppage of work which was caused by a labor dispute. Third, the term "stoppage of work" means stoppage of work done at the plant, not cessation of work by the employee, and since production continued in this case, there was no stoppage of work. Fourth, That the Findings and Conclusions of the Board that the composing room department of the employer constituted a separate department commonly conducted as a separate business, were wholly unsupported by the evidence and are, therefore, contrary to law. They finally contend that since the Referee found there was no substantial stoppage of work and that the employer's composing room did not constitute a separate factory or establishment, and the employer did not appeal from the Findings of the Referee in the manner prescribed by the statute, they are final and therefore the employer has waived those questions.

We agree with the employees that this Act should be liberally construed to give effect to its beneficent, humane and sound economic policy. However, this liberality does not permit the giving of its benefits to those whom the legislature has posi-

tively determined should not have such benefits. Such construction on our part would be judicial legislation which might nullify its purposes. *News Publishing Co. v. Verweire* (1943), 113 Ind. App. 451, 49 N. E. 2d 161. Our courts have on several occasions defined the objective of this Act. On this question we recently said:

> "It is intended to benefit those who are out of employment because the employer is unable, for reasons beyond the employees' control, to provide work, or the proffered work endangers the health, safety and morals of the employee, or the working conditions, or wages are below the standards prevailing in the community for the same type of work. It is not intended to finance those who are willingly refusing to work, when work is available, because of a labor dispute." *Frank Foundries Corporation v. Review Board etc. et al.* (1949), 119 Ind. App. 693, 88 N. E. 2d 160 (Transfer denied), and authorities there cited.

We are of the opinion § 52-1539c, *supra*, is complementary to the provision of § 52-1525, Burns' 1933 (1949 Supp.) defining the purpose and objective of the Act. It is added evidence of the very positive intent of the legislature to deny the benefits of the Act to those whose unemployment is not involuntary.

We agree with appellants that before an employee is ineligible for benefits under this provision of the statute, there must be a stoppage of work which is or has been caused by a labor dispute. However, under the provisions of the above section of the statute it is not always essential that the stoppage of work and the labor dispute exist concurrently. The decisive test is—Did the labor dispute cause the work stoppage? *Carnegie-Illinois Steel Corporation v. Review Board, etc., et al.* (1947), 117 Ind. App. 379, 72

N. E. 2d 662; *Frank Foundries Corporation* v. *Review. Board etc. et al., supra.*

Unquestionably there was a labor dispute between the employees herein and the employer. *Walter Bledsoe Coal Company et al.* v. *Review Board of Employment Security Division etc.* (1943), 221 Ind. 16, 46 N. E. 2d 477; *Muncie Foundry Division of Borg-Warner Corporation* v. *Review Board, etc.* (1944), 114 Ind. App. 475, 484, 51 N. E. 2d 891; *Adkins et al.* v. *Indiana Employment Security Division et al.* (1946), 117 Ind. App. 132, 70 N. E. 2d 31. We must next determine if, as a result of this labor dispute, there was a stoppage of work which would render the employees ineligible for benefits under the Act.

In support of its contention that the term "stoppage of work" means stoppage of work done at the plant, not cessation of work by the employee, the employees cite, among others, the cases of *Carnegie-Illinois Steel Corporation* v. *Review Board, etc., supra; Sakrison et al.* v. *Pierce et al.* (1947), 66 Ariz. 162, 185 P. 2d 528, 531.

An examination of these cases and the authorities upon which they are based, discloses that while they assert the rule is as stated above, the facts upon which these decisions were made are materially different from those in this case.

In the case of *Carnegie-Illinois Steel Corporation* v. *Review Board, etc., supra,* we said:

"The question before the court is whether a stoppage of work immediately subsequent to a labor dispute which stoppage of work would not have occurred except for the labor dispute disqualifies employees involved in the labor dispute during the subsequent stoppage."

In defining a work stoppage we said:

"Stoppage of work has been held to mean since the passage of the Indiana Employment Security Act *a curtailment of production affecting unemployment rather than a plant-wide stoppage.* A stoppage of work commences at the plant of the employer when a definite check in production operation occurs. A stoppage of work ceases when operations are resumed on a normal basis." (Our emphasis).

In that case we held employees of certain departments of appellant were ineligible for benefits, where, for nearly a month after the labor dispute had been settled, work was unavailable to such employees because it was necessary to have certain operations performed such as the repairing of oven blast furnaces, etc. We adhere to the ruling in that case but fail to see how it helps the employees' case.

The facts in the case of *Saunders* v. *Md. Unemp. Com. Bd.* (1947), 188 Md. 677, 53 A. 2d 579, were the same as those in the Carnegie case and the Maryland Supreme Court reached the same result that we did in that case.

In the case of *Sakrison et al.* v. *Pierce et al., supra,* one hundred and five employees of a Hotel Company went on strike on November 7, 1946. The strikers picketed the hotel. From and after November 19, 1946, the hotel had fully resumed operations by replacing the strikers with other employees. The striking employees sought and were granted unemployment compensation benefits from said last mentioned date. In affirming the judgment of the Superior Court, the Supreme Court of Arizona said the term "stoppage of work" until that time had been interpreted by only seven courts of last resort. It then said, in part:

"In six of these, it has been held to mean stoppage of work of employer's establishment, not

cessation of employees' labors. Lawrence Baking Co. v. Michigan U. C. C., 308 Mich. 198, 13 N. W. 2d 260, 154 A. L. R. 660; Deshler Broom Factory v. Kinney, 140 Neb. 889, 2 N. W. 2d 332; Magner v. Kinney, 141 Neb. 122, 2 N. W. 2d 689, noted in U. of Chicago L. R. 75; Walgreen Co. v. Murphy, 386 Ill. 32, 53 N. E. 2d 390; Saunders v. Maryland Unemployment Compensation Bd., Md., 53 A. 2d 579; Carnegie-Ill. Steel Corporation v. The Review Board, etc., Ind. App., 72 N. E. 2d 662."

It is to be noted in that case that there was no claim for benefits until after the strikers had been replaced by other employees who performed the same work in the same manner as the striking employees.

In the case of *Lawrence Baking Co.* v. *Michigan U. C. C.,* *supra,* the striking employees were immediately discharged by the employer and other persons were hired to do their work.

It seems to us that by their decision in both of the last mentioned cases the Supreme Courts of Arizona and Michigan, put the "cart before the horse" in that they completely ignored the import of the term "labor dispute," as used in the section of the statute they were construing. That section was similar to § 52-1539c, *supra.* It seems obvious to us that the term "labor dispute" as used in this section necessarily implies the existence of the relationship of employer and employee. Ordinarily when such relationship has been terminated the section referred to is not applicable.

In the case of *Deshler Broom Factory* v. *Kinney,* *supra,* the court held where more than 90 employees ceased work because they had not received wages and the factory was not able to continue operations, there was a labor dispute and work stoppage that would deny employees the benefits of the unemployment act.

In the case of *Magner et al.* v. *Kinney, supra,* the disqualification provision of the statute was analogous to ours. The court stated the facts as follows:

"All truckers who belonged to the Nebraska Truckers Association (of which the Fidelity Storage & Can Company was one) had a contract with the drivers union 'last year' relating to wages, terms and conditions of employment. This contract expired in June, 1938. When the contract expired negotiations were opened to modify the contract, and there was an agreement between union officials who represented claimants herein and the truckers association that the old contract and its terms should remain in force pending negotiations. These negotiations continued until in September following, when disagreement over the demand of the employees for a 'closed shop' contract resulted in the strike order of September 13, 1938. It is obvious that a labor dispute existed between these parties from and after June, 1938. This ripened into a strike in September, 1938. The Act does not require consideration of the demands, negotiations and other events which preceded the final rupture, except for the purpose of determining whether they constituted a labor dispute."

The court then said:

"The phrase as used in the disqualification clause subsection (d), refers to the effect upon the employer's operations produced by the labor dispute or, in other words, to resulting unemployment. Subject to its exceptions, it declares disqualification of a class or group whose unemployment is the result of the *curtailment* or stoppage of the employer's operations. It does not refer to the cessation of work by the individual employee or employees. The disqualification is not personal, but rather for a period of time—the duration of the stoppage.

"A labor dispute may produce a stoppage or *curtailment* of work in an employing establishment in three ways: (1) The cessation of work *by all or part of the employees;* (2) the cessation

of work by a part of the employees may disable the employer from utilizing the services of other employees; (3) it may diminish patronage by customers or the public of the employing establishment and thereby produce a compensating unemployment of workers. In either event the resulting unemployment is due to a stoppage of work because of the labor dispute. Obviously, if those leaving work are immediately replaced, or if the dispute *does not otherwise interfere* with production or operation and these are not diminished, there is no stoppage of work and hence no disqualification." (Our emphasis.)

In reversing the award the court held there was a substantial curtailment of the employer's business because its operations were reduced 30%. While the facts are clearly distinguishable from those in this case, it is to be noted the court in that case held that where a labor dispute caused a stoppage or curtailment of work by all or *part of the employees* the unemployment resulting therefrom was a "stoppage of work" which would make the employees ineligible for the benefits of the Act.

In support of their contention that the composing room department of the employer does not constitute a branch of work conducted in a separate department which is commonly conducted as a separate business etc., the employees cite the cases of *Spielman* v. *Ind. Comm.* (1940), 236 Wis. 240, 295 N. W. 1, and *Chrysler Corp.* v. *Smith* (1941), 297 Mich. 438, 298 N. W. 87.

In the Spielman case the facts may be summarized as follows: The Nash automobile company operated three plants for the manufacture of automobiles. It had assembly plants at Racine and Kenosha and its body plant was in Milwaukee. The plants were synchronized and operated as a unit. The Racine and Kenosha plants were interdependent, each produced many of the parts needed by, but not produced by the

other. A labor dispute arose at the Racine plant which produced a work stoppage. Being dependent on the Racine plant for numerous parts the Kenosha plant was forced to shut down. The court affirmed the decision of the Commission which denied the employees of the Kenosha and Milwaukee plants unemployment benefits on the grounds the business constituted a single establishment and that their unemployment was the result of a bona fide labor dispute. The Wisconsin statute is somewhat different from ours. It contains no provision about separate branches, etc. However, it is to be noted there is no intimation in the decision that if the work stoppage had occurred only in the Racine plant that the employees of that plant who were unemployed because of a labor dispute would be entitled to benefits because all of the plants had not been closed as a result of such dispute. Yet that is the question we are confronted with in this case. The facts and decision in the Chrysler case relate to the same kind of a situation in the various Chrysler plants in Detroit.

In the case of the *Board of Review* v. *Mid-Continent Petroleum Corp.* (1943), 193 Okla. 36, 141 P. 2d 69, the Board awarded compensation to the claimant who with about two hundred other employees of appellant went out on strike and appellant's plant continued to operate at its normal capacity. The Oklahoma disqualification statute is identical to § 52-1539c, *supra.* Two contentions were made before the Supreme Court in that case. The employee in that case, as here, contended the term "stoppage of work" meant a stoppage at the plant which produced a substantial shut-down where the strike took place. In what we consider a well reasoned opinion the Supreme Court in that case rejected the employee's contention and held the term to mean the employee's "stoppage of work." In that case the Board based its award on a letter from the

employer to the employee which the Board considered a dismissal. The Supreme Court held the letter was not a dismissal and that the subsequent acts of the claimant indicated he did not so construe the letter. It was pointed out the employee could have terminated his employment at any time by resigning.

In the case of *Walgreen Co.* v. *Murphy, supra,* the facts may be summarized as follows: The Company was engaged in the wholesale and retail sales of drugs and other merchandise commonly used in drug stores. It owned and operated 240 retail stores. It also owned a warehouse in Chicago from which wholesale sales were made to its own stores and to other independent stores. The N. L. R. B. had found that the employees of this warehouse constituted a unit appropriate for the purposes of collective bargaining and that the Chicago Drug Workers Association was their exclusive bargaining representative. A labor dispute arose and the employees were on strike for about three weeks. After the strike settlement they applied for and were granted unemployment compensation for the period they were on strike. In a well-reasoned opinion reversing the award the Supreme Court of Illinois rejected the contention of the employees and the Board that the warehouse was not an establishment because it performs functions incident to the company's entire system of transacting business and for the further reason that the retail stores did not cease operations while the strike was in progress. It seems to us this case tends to support the decision of the Board more than it does the contention of the employees.

The facts in the case of *Caterpillar Tractor Co.* v. *Durkin, Director of Labor, et al.* (1942), 380 Ill. 11, 42 N. E. 2d 541, are more nearly analogous to the facts in this case than any which have been called to our

attention. In that case the court stated the facts as follows:

"Prior to November 18, 1940, plaintiff in error employed at its East Peoria plant 11,750 employees, 10,000 of whom engaged in manufacturing operations. One of the departments of the factory is the pattern shop. It has its own superintendent and is the only department at the factory with a separate maintenance crew. Plaintiff. in error conducts an apprentice training school for the pattern shop workers whose course of instruction is different from that given to other employees. The employees of the pattern shop use a time clock located within the shop. The work of the pattern shop is to make patterns from which grey iron castings are moulded. There are in existence throughout the country pattern shops not connected with any foundry which make a business of supplying patterns to foundries and manufacturing plants. During the peak periods when its own shop is overloaded, plaintiff in error buys some patterns from these independent shops."

"A wage dispute arose, and on November 18, 1940, the 108 pattern makers went out on a strike. . . .

"The sole question involved in this case is whether the striking pattern shop employees are entitled to benefits under the Unemployment Compensation Act."

The Illinois statute is identical to § 52-1539c, *supra.* In reversing the award of benefits, the Court said:

"This subsection clearly provides that a department with a separate branch of work that is commonly conducted as a separate business shall be deemed to be 'a separate factory, establishment, or other premises' within the meaning of the act. Pattern making shops are commonly conducted as separate businesses. The pattern shop here was a separate department of the factory. It had its own foreman, supervisor, time clock, maintenance crew, and training school. Pattern making is recognized as a specialized trade."

It is now recognized that employees of a department of a large plant or store, even though such employees constitute only an infinitesimal percentage of the total employees, if they have a degree of self-organization and a special trade which differentiates them from other employees, constitute an appropriate unit for collective bargaining. *May Department Stores* v. *National Labor Relations Board* (1945), 326 U. S. 376, 90 L. Ed. 145. If the employees in such a unit, because of a labor dispute, exercised their right to strike in an effort to enforce their demands, and a work stoppage resulted therefrom, could it be seriously contended they were entitled to the benefits of the Act? We think not.

The record discloses that immediately subsequent to the employer's refusal to meet the demand of the employees of the composing room for a wage increase of $14.89 per week, these employees engaged in a slow down which resulted in a decrease in production to a level of about 40% of normal. After the complaint of the employer to the Union representatives failed to bring about a permanent improvement of this condition, the employer ordered the composing room closed until further notice. There is nothing in the record nor is it intimated or contended that the employees were discharged. It is uncontradicted that the employer was at all times during the work stoppage ready, willing, able and anxious to take these employees back if they would perform a full day's work for a full day's pay. There is no contention that the employees herein had quit their employment with the employer. They considered themselves employees who were locked out. The composing room was a separate department. The employer's plant is operated on a craft basis. A separate Union, Chicago Typographical Union No. 16, represents the employees of this depart-

ment exclusively. Some of the employer's large competitors do not have a composing room. Since the lockout practically no work has been done in the composing room and no machines have been operated in there. The volume of work produced in this room amounted to 10% of the total production of the employer.

We are of the opinion the provisions of § 52-1539c render ineligible for benefits the employees of a separate department of an employer's business when a labor dispute between such employees and the employer has caused a work stoppage which resulted in a curtailment or complete stoppage of work in such department. This is particularly true where the employees of such department have a separate trade which differentiates them from other employees and there is a degree of self organization therein. In our opinion this disqualification would not be removed because the employer in an effort to keep his business in operation and to provide employment for employees of other departments, not involved in the labor dispute, temporarily used a different plan or method to obtain the results normally produced by such departments. In other words, where the labor dispute interferes with the normal plan of operation the disqualification is applicable. It seems to us any other construction would ignore the positive mandate of the legislature that the beneficent and humane objectives of the act shall not be used to penalize or subsidize either the employer or the employee who is engaged in a labor dispute.

Finally, there is no merit to the employees' contention that because the employer did not appeal from the decision of the Referee which denied the employees' claim for benefits, but found there was no substantial stoppage of work and did not find its composing room constituted a separate factory or establishment, the employer has waived those ques-

tions here. The employer had no occasion to appeal from the decision of the Referee which was in its favor. The Board has the power to affirm, modify or reverse the Referee's decision.

The decision of the Board is affirmed.

Crumpacker, J., not participating.

Bowen, J., concurs in result.

NOTE.—Reported in 90 N. E. 2d 353.