146 Ind. App. 278 (1970)
255 N.E.2d 107
GENERAL MOTORS CORP.
v.
REVIEW BOARD, IND. EMP. SEC. DIV.
No. 268A12.
Court of Appeals of Indiana.
Filed February 4, 1970.
Rehearing denied March 13, 1970.
Transfer denied October 20, 1970.
*279 Eugene C. Miller, Jr., Robert L. McLaughlin, Barnes, Hickman, Pantzer & Boyd of Indianapolis, Ross L. Malone, K. Douglass Mann, of counsel, of Detroit, Michigan, for appellant.
Lloyd DeWester, Jr., Ross P. Walker, L. Owen Bolinger, of Indianapolis, for claimants-appellees; Theodore L. Sendak, Attorney General, William E. Matheny, Deputy Attorney General, for appellee Review Board.
COOPER, J.
This judicial review arises out of a consolidated proceeding before the Indiana Employment Security Division wherein the Review Board awarded unemployment compensation to approximately 8,000 claimants for various periods between September 25 and November 10, 1964.
It appears from the record that the claimants filed their original claims before an appeals referee who decided the issues in favor of the appellant herein, holding that the claimants were not entitled to benefits for the period in question.
On review by the Review Board, the Board reversed the appeals referee and held that the claimants were entitled to benefits. The findings, conclusions and decision of the Review Board are as follows:
"STATEMENT OF FACTS: The record disclosed that:
(1) During the summer and fall of 1964, General Motors Corporation and the International Union, UAW, *280 AFL-CIO, engaged in collective bargaining on a company-wide level and simultaneously the individual local unions were engaged in the negotiation of local issues with their respective resident management.
(2) All claimants involved herein were, at the time in question, members of the above-mentioned union, (hereinafter referred to as the `UAW'), by reason of membership in their respective local unions.
(3) The purposes of the company-wide negotiations were to make certain changes in the National Agreement between the UAW and General Motors Corporation, (hereinafter referred to as `GM'), and said National Agreement would cover all employees in the company-wide bargaining unit.
(4) On September 25, 1964, at 10 a.m., EST., the UAW called a strike at 89 widely separated GM plants. The employees at 41 other GM plants were instructed to continue working by the UAW. The four Indiana plants involved herein were among those 41 plants which continued working.
(5) As a result of an affirmative strike vote by the members, the International UAW was given authority to strike and to determine which plants, if any, would be struck.
(6) Of the 89 GM plants which were struck, some but not all were GM assembly plants. The four plants involved herein were manufacturers of parts and supplies. When the assembly plants were struck, the parts and supplier plants were faced with a lack of work, which, in turn, resulted in a layoff at some plants but there was no plant involved herein that was completely shut down unless said plant was actually shut down due to a strike on local issues.
(7) A new National Agreement went into effect on November 10, 1964, and three of the four plants involved herein resumed production shortly thereafter. The Bedford plant, after settling local issues, had resumed production at an earlier date.
"Both at the referee hearing and before the Review Board, the following was the contention of GM: that the UAW used a `selective strike strategy' in order to exert maximum pressure against GM in support of its demands; that all claimants herein were members of the same International Union; that all claimants herein voted affirmatively in favor *281 of the strike; that all claimants herein were willing to work only because they were directed to do so by the UAW; that all claimants herein were unable to work because of the action taken by the UAW; and that the claimants should have known, and did know, that the shutting down of the `assembly' plants would necessitate the shutting down of the `supplier' plants, due to the lack of warehouse facilities throughout the GM system.
"It was the contention of the claimants herein that they were willing to return to work during the period of September 25, 1964, through November 10, 1964, but were unable to do so because there was no work available for them at their employing plants. The claimants further argued that any labor dispute which caused their unemployment existed at the 89 plants which were, in fact, struck by the UAW and although there may have been a local labor dispute at each of the four plants involved herein, these local disputes had no causal connection with the claimants' unemployment. The claimants stated that § 1504 requires two elements for disqualification; namely, a stoppage of work and a labor dispute, and contended that both of these elements must exist at the factory, establishment, or other premises where claimants were last employed. The claimants pointed out that the plants involved herein were geographically separate from the plants actually struck by the UAW and, therefore, there was no stoppage because of a labor dispute at these four plants.
"Although numerous cases were cited by both parties during the hearings and in their briefs, no Indiana decision was submitted which could be said to be squarely in point with the facts as presented in this appeal.
"FINDINGS AND CONCLUSIONS: The Review Board finds that:
(1) GM is a very highly integrated organization. This organization consists of numerous, separate and distinct corporations whose dealings are with the general public, other manufacturers, and others outside the official GM family.
(2) The collective bargaining involved herein was carried on by the International UAW on behalf of all its members who were employed by GM.
(3) At the time the claimants herein were seeking benefits, there was no strike involved at the factory, establishment or other premises where these claimants *282 were last employed nor is there any contention that the employer locked out said claimants. They were laid off due to a lack of work.
(4) During the time mentioned herein, GM continued to operate the four plants in question so far as they had available work. There is no testimony that operations were only on a standby or maintenance basis. There is no testimony of a slowdown or curtailment of production being used as a tool by either labor or management in negotiations at the four plants in question.
(5) The record reveals that prior to the signing of a National Agreement, local issues in dispute were settled at least at one of the plants involved herein and the employees returned to work about October 22, 1964, at the Central Foundry in Bedford, Indiana, but the National Agreement between GM and UAW was not signed until November 10, 1964.
"In view of the above facts, this Board concludes that:
(1) All claimants herein were members of the UAW.
(2) The UAW and GM were negotiating the National Agreement.
(3) There were strikes at some scattered GM plants.
(4) There were not strikes at any of the four GM plants involved herein during the time that the claimants herein have applied for unemployment compensation benefits.
(5) There was no general plant shutdown, lockout, or controlled curtailment of production at any of the four plants involved herein during the time which claimants have applied for benefits.
(6) There were layoffs at all four of the plants involved herein due to the fact there was no work available at the time.
"The Review Board ultimately concludes that there was no strike, lockout, or other directly attributed shortage of work due to a labor dispute at the factory, plant, or establishment where the claimants were last employed and, therefore, § 1504 of the Act is not applicable.
"DECISION: The decision of the referee is hereby reversed this 30th day of October, 1967, and provided they are otherwise eligible, the claimants are entitled to benefits."
*283 The sole assigned error in this review, is that the Review Board's decision is contrary to law. The appellant bases its assigned error on three major premises, namely: First, that the Review Board's findings are not supported by the evidence; second, that the findings do not support the ultimate conclusion reached, either as that conclusion is stated by the Review Board or as is required to determine eligibility under Sec. 1504 of the Employment Security Act; and third, the Review Board's ultimate conclusion rests on an interpretation of the governing statute which is erroneous as a matter of law.
The governing statute involved in this matter in Burns' Indiana Statutes, Anno., (1964 Repl.) Sec. 52-1539 (c), the pertinent part of which reads as follows:
"An individual shall be ineligible for waiting period or benefit rights: for any week with respect to which an employee of the division, designated by the director and hereinafter referred to as the deputy, finds that his total or partial or part-total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed; Provided, That this section shall not apply if it is shown to the satisfaction of the deputy that: he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; and he has not voluntarily stopped working, other than at the direction of his employer, in sympathy with employees in some other establishment or factory in which a labor dispute is in progress; ..."
We cannot agree with the appellant in its contention that the findings are not supported by the evidence. Our Supreme Court set forth the duty of a court on judicial review in the case of Ross et al. v. Review Bd., of Ind. Emp. Sec. Div. *284 (1962), 243 Ind. 61, 65, 182 N.E.2d 585, wherein the Court stated:
"It is well settled that the burden is on appellant to show error on appeal. As long as there is any substantial ground upon which the decision of the lower tribunal may be sustained on appeal, the judgment will not be reversed. The reviewing court may examine the entire record to sustain the lower court's action. The court does not search the record to reverse, although it may do so in order to affirm. State ex rel. Tittle v. Covington, etc., Schools (1951), 229 Ind. 208, 96 N.E.2d 334; City of Ft. Wayne v. Bishop (1950), 228 Ind. 304, 92 N.E.2d 544; 2 I.L.E., Appeals, Sec. 461, p. 332, 333; F.W.&H., Ind. Tr. & App. Pract., 1961 Pocket Supp., Sec. 2783, p. 134....
"The rule as stated by the Appellate Court in Merkle v. Review Bd., Emp. Sec. Div. (1950), 120 Ind. App. 108, 111, 90 N.E.2d 524, is as follows:
`Burns' 1933 (1949 Supp.) Sec. 52-1542k provides that: "Any decision of the review board shall be conclusive and binding as to all questions of fact." This means that we are not at liberty to weigh the evidence. We must accept the facts as found by the board and can disregard them only in the event they are not sustained by any evidence of probative value.'" (Authorities omitted)
Our Supreme Court affirmed the above rule in the case of Adams et al. v. Review Bd. Ind. Emp. Sec. Div. et al. (1957), 237 Ind. 63, 69, 143 N.E.2d 564, wherein the Court stated:
"The question whether a claimant is available for work so as to be entitled to unemployment benefit payments is one of fact to be determined by the Review Board. (Authority omitted)
"It is the general rule that the decision of the Board as to all questions of fact is conclusive and binding upon the court; and the court will not disturb the decision of the Board `unless reasonable men would be bound to reach a different conclusion on the evidence' in the record ..."
A review of the record in this judicial review reveals that the evidence concerning the facts was conflicting. Because *285 of such conflicting evidence, we cannot say that reasonable men would have reached a different conclusion than that reached by the Review Board herein on the record now before us.
The second premise relied upon by the Appellant is that the ultimate conclusion reached by the Review Board is not supported by the findings as required to determine eligibility under Sec. 1504 of the Employment Security Act. Appellant contends in substance, that the Review Board concluded that Sec. 1504 was not applicable because "there was no strike, lockout, or other directly attributed shortage of work due to a labor dispute at the factory, plant, or establishment where the claimants were last employed." The Appellant further contends that what the Review Board meant by this language conflicts fundamentally with the meaning this Court has consistently assigned to the statutory mandate that a claimant is ineligible for benefits if his employment is "due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he was last employed." (Our emphasis)
This Court, in the case of Carnegie-Ill., etc. v. Review Board, etc. (1947), 117 Ind. App. 379, 391, 72 N.E.2d 662, defined "work stoppage" as follows:
"Stoppage of work has been held to mean since the passage of the Indiana Employment Secruity Act a curtailment of production affecting unemployment rather than a plantwide stoppage ... A stoppage of work commences at the plant of the employer when a definite check in production operations occurs. A stoppage of work ceases when operations are resumed on a normal basis. (authorities omitted)."
In this regard, the Review Board herein made the following conclusion:
"(5) There was no general plant shutdown, lockout, or controlled curtailment of production at any of the four plants involved herein during the time which claimants have applied for benefits."
*286 This conclusion, when coupled with the second important phrase of Sec. 52-1539 (c), which reads in part "... because of a labor dispute at the factory, establishment or other premises at which he was last employed," presents the crux of this review: Was there a labor dispute at the factory, establishment or other premise of the claimants herein, which resulted in the work stoppage?
This Court, in the case of Frank Foundries Corp. v. Rev. Bd. (1949), 119 Ind. App. 693, 698, 88 N.E.2d 160, defined the purpose of the Act as follows:
"The purpose of the Act is to provide benefits for those who are involuntarily out of employment. In other words, it is intended to benefit those who are out of employment because the employer is unable, for reasons beyond the employees' control, to provide work, ... It is not intended to finance those who are willingly refusing to work, when work is available because of a labor dispute. (authorities omitted)"
The Review Board herein reached the conclusion that:
"There were layoffs at all four of the plants involved herein due to the fact that there was no work available at the time."
After a review of the record, we agree with the Review Board that there were layoffs at the four plants because there was no work available. We furthermore are of the opinion that there was no labor dispute at these four factories, as that term is used in our statute. The probem arises when the term "establishment" is used as provided in the governing statute. Were these four plants part of the "establishment" which caused a work stoppage because of a labor dispute? If Appellant is to succeed in this judicial review, these four plants must be part of a nation-wide system which constitutes one "establishment" because of the "functional integration" of its plants.
In the case of Abnie v. Ford Motor Co. (1963), 175 Ohio St. 273, 194 N.E.2d 136, 137, the Supreme Court of Ohio was presented *287 a similar question as that presented in this review. The pertinent Ohio Statutory language reads as follows:
"(1) lost his employment or has left his employment by reason of a labor dispute (other than a lockout) at the factory, establishment, or other premises at which he was employed ..." (our emphasis)
In interpreting the definition of "establishment" the Court stated at page 138:
"The word, `establishment,' has a clear and natural meaning as a distinct physical place of business. In other words, `establishment' as used in this act connotes a place of employment. The fact that, as here, an employer conducts a highly integrated business composed of individual units spread over many states with the operation of each unit interdependent on the operation of the other units does not constitute such business an `establishment' within the meaning of this act."
In the case of Nordling v. Ford Motor Co. (1950), 231 Minn. 68, 89, 42 N.W.2d 576, the Court held:
"We believe that the solution of the problem lies in determining from all the facts available whether the unit under consideration is a separate establishment from the standpoint of employment and not whether it is a single enterprise from the standpoint of management or for the more efficient production of goods." (our emphasis)
In deciding whether a unit of employment is a separate establishment, the decision must be based on all facts relating to the relationship of the employee to the unit of employment. Factors to be taken into consideration may include the functional integration of the corporation's plants, the general unity of the plants as a whole, and the physical proximity of one plant to other plants, but these factors are not the sole tests. Nordling v. Ford Motor Co., supra; Northwest Airlines, Inc. v. Mich. Emp. Sec. App. Bd. (1966), 378 Mich. 119, 142 N.W.2d 649, 654; Park v. App. Board of Mich. Emp. Sec. Comm. (1959), 355 Mich. 103, 94 N.W.2d 407.
*288 Other factors to consider are the hiring and firing of employees, the relationships between local unions and national unions, and the local agreements, including wages, seniority rights, etc. Applying the above factors to the record in this judicial review, we cannot say as a matter of law that the decision of the Review Board is contrary to the statutory mandate of Section 1504.
The final contention of the appellant is that the claimants were on strike because their exclusive authorized bargaining representative, the International Union, had taken the action to provide effective leverage in its bargaining with General Motors Corporation. Appellant further contends that pursuant to paragraph 118 of the National Agreement, the local unions were bound to any decision or action taken by such International Union.
In the case of Jenkins v. Review Bd. of Ind. Emp. Sec. Div. (1965), 138 Ind. App. 12, 22, 211 N.E.2d 42, 47, our Court stated:
"It is undisputable and clear that a union in concert with an employer cannot waive, release or commute by specific provision or implication any of the rights and benefits of the individual under the Act. If such an agreement to do so were made, the provision would be void as against the statutorily expressed public policy."
To hold otherwise would violate the declared purpose of the Act to provide benefits for persons who are involuntarily out of employment Burns' Ind. Stat. Anno. (1964 Repl.), Sec. 52-1525; Walter Bledsoe Coal Co. v. Review Board., etc. (1943), 221 Ind. 16, 46 N.E.2d 477. We are therefore of the opinion that the final contention of the Appellant is without merit.
For all of the above and foregoing reasons, we cannot say, as a matter of law, that the decision of the Review Board is contrary to law, and we must, therefore, affirm its decision.
Decision affirmed. Costs vs. Appellant.
*289 Carson, J., Lowdermilk, C.J., concur; Sullivan, J., concurs in result only, with separate opinion.
CONCURRING OPINION
SULLIVAN, J.
Appellant assigns as sole error that the decision of the Review Board is contrary to law. It argues among other things that the findings of the Board do not support the ultimate conclusion reached by the Board. With this contention I agree, but I cannot draw from that area of agreement any authority on our part to reverse the Board. I concur in the result reached by the majority only for the reason that in my opinion the appellant-employer has not shown as a matter of law that the appellees-employees were ineligible to receive benefits.
It seems apparent to me from a reading of the Employment Security Act and the Rules duly promulgated thereunder by the Indiana Employment Security Board that at the administrative level it is the burden of the employer to prove the ineligibility or disqualification of the employee if an alleged labor dispute is involved in the claim. Indiana Acts 1947, ch. 208, § 1504, as amended and as found in Indiana Annotated Statutes § 52-1539c (Burns' 1964 Repl.); Indiana Acts 1947, ch. 208, § 1802, as amended and as found in Indiana Annotated Statutes § 52-1542a(c) (Burns' 1969 Supp.); Indiana Employment Security Board Rule (52-1542)-1, as found in Indiana Annotated Statutes (Burns' 1967 Rules & Regulations).
It is only logical and practical that the burden be upon the employer rather than to require the employee to prove negatively that he was not terminated due to a "stoppage of work existing because of a labor dispute at the factory, establishment, or other premises at which he was last employed." See Thomas Products Co., Inc. v. Review Board (1969), 145 Ind. App. 425, 251 N.E.2d 473.
Looking to the determination of the full Review Board in *290 our case, it would appear, superficially, to be an affirmative award because it grants benefits to the claimants-employees. With reference, however, to the party having the burden of proof, i.e., the employer, that determination is a negative award. In other words, the Board determined that the employer had not shown the employees to be ineligible.
Upon appeal by the employer under such circumstances, it is not within our power or authority to test either the affirmability or the reversability of the Review Board's decision in the light of the adequacy of the factual findings.[1]
Therefore, we cannot say that the decision here is erroneous unless appellant-employer, having had the burden of proof before the full board, shows by the record that each of the statutory prerequisites for disqualification were established before the board as a matter of law. Metropolitan Board of Zoning Appeals v. Standard Life Insurance Co. (1969), 145 Ind. App. ___, 251 N.E.2d 60. This, appellant has not done.
In short, it seems that, notwithstanding the requirements of the Rules & Regulations of the Employment Security Board, insofar as they require findings of fact by the Review Board, the failure of such Board to make adequate, or in fact any, findings does not in itself authorize reversal. Before such findings or the adequacy thereof become germane to proper appellate review it must appear that the party having the burden of proof before the administrative agency obtained an affirmative award or decision. The defeated party may then appropriately assert that the award or decision is not supported by adequate findings. If, however, at the administrative level, the party having the burden suffers an adverse decision, the findings, if any, of the Board, lose their significance because *291 that party must obtain reversal, if at all, upon the strength of its having carried the burden of proof upon all essential issues as a matter of law. If that party cannot do so, it is of little consequence that the findings made by the Board do not affirmatively support the ultimate result.
The Rules and Regulations of the Employment Security Board however, do, in fact, require the Review Board to set forth in writing its findings of fact. Indiana Employment Security Board Rule (52-1542j)-1, as found in Indiana Annotated Statutes (Burns' 1967 Rules & Regulations).[2]
Therefore, even though I feel that the quality of the factual findings here cannot affect the duty of this Court to affirm, since appellant has failed to show, or even argue, that each element of statutory disqualification was present as a matter of law, I nevertheless feel compelled to disassociate myself from any holding, dictum, or inference of the majority opinion that such findings support the ultimate conclusion as reached by the Review Board.
The Findings and Conclusions of the Board, together with its Statement of Facts, are set forth in the majority opinion and need not be restated here. Certain other matters of evidence not therein contained are deemed of import, however, insofar as those findings are concerned.
The undisputed evidence shows that on September 25, 1964, by order of the International Union United Auto Workers, 89 plants of General Motors Corporation were struck simultaneously across the country by the UAW membership, and that as a result the entire automotive operations of the corporation were virtually shut down.
The evidence also establishes that the direct impact of the strike was pervasive throughout the system; that production at the 41 GM parts plants selectively excluded by the International *292 Union from direct strike action was substantially curtailed; that this was recognized by the union leadership and membership as the inevitable consequence of the union's selective strike strategy; and that normal production could not be resumed at these plants until all issues in the entire dispute had been settled and a new National Agreement signed.
The evidence shows, finally, that this was true with respect to the four specific locations involved in this proceeding, at three of which the employees actively joined the strike; and at all four of which a substantial curtailment of production resulted.
The findings made by the Board, while perhaps supported by evidence, do not support the ultimate decision. To the contrary, such findings are for the most part irrelevant to that ultimate decision and to the award granted the employees-appellees.
Appellees here are ineligible for benefits under the Employment Security Act if their unemployment for the period here involved was due to (1) a labor dispute which (2) caused (3) a work stoppage (4) at the factory, establishment or other premises where they were last employed. Acts 1947, ch. 208, § 1504, as amended and as found in Indiana Annotated Statutes § 52-1539c (Burns' 1964 Repl.). The ultimate conclusion stated by the Board here, in purported support of its decision and award, is as follows:
"The Review Board ultimately concludes that there was no strike, lockout, or other directly attributed shortage (sic) of work due to a labor dispute at the factory, plant, or establishment where the claimants were last employed and, therefore, § 1504 of the Act is not applicable." (Emphasis supplied)
This ultimate conclusion is unsupported by any findings of fact or conclusion of law with reference to causal relationship between the admitted labor dispute and the admitted work stoppage. To the contrary, paragraph 6 of the Statement of Facts made by the Board, in my opinion, requires a finding *293 as to causation which would render the Board's ultimate conclusion erroneous. That paragraph reads as follows:
"(6) Of the 89 GM plants which were struck, some but not all were GM assembly plants. The four plants involved herein were manufacturers of parts and supplies. When the assembly plants were struck, the parts and supplier plants were faced with a lack of work which, in turn, resulted in a layoff at some plants but there was no plant involved herein that was completely shut down unless said plant was actually shut down due to a strike on local issues." (Emphasis supplied)
That portion of the Statement of Facts, in my estimation, requires a finding of ultimate fact that the strikes at the assembly plants were the cause of work unavailability at the four plants with which we are concerned. Obviously, such finding of ultimate fact was not made nor was any direct finding made concerning causation. It is argued that Finding of Fact No. 3 and Finding of Fact No. 4, as stated by the Board, constitute and provide the negative causative element. At first blush, the seeming meticulous phrasing of such findings might give that impression. Such findings are as follows:
"(3) At the time the claimants herein were seeking benefits, there was no strike involved at the factory, establishment, or other premises where these claimants were last employed nor is there any contention that the employer locked out said claimants. They were laid off due to a lack of work.
"(4) During the time mentioned herein, GM continued to operate the four plants in question so far as they had available work. There is no testimony that operations were only on a standby or maintenance basis. There is no testimony of a slowdown or curtailment of production being used as a tool by either labor or management in negotiations at the four plants in question."
In fact and in substance, however, Finding No. 3 merely states that there was no "strike" at any of the four plants here involved but that there was a lack of work. Finding No. *294 4 merely states that production slowdown or curtailment, if any, was not being used as a tool in the labor negotiations. Neither, nor both, of these findings exclude an ultimate conclusion of fact that there was production curtailment, i.e., work stoppage, caused by a "labor dispute."
I think it is appropriate to point out that certain of the other findings and conclusions made by the Board do not support the ultimate conclusion made by it. First, the Board found that there was no "controlled" curtailment of production, i.e., work stoppage. Such finding, however, is not a finding that production was not substantially curtailed at these four plants. The test to determine whether or not there has been a "work stoppage" as set forth in Carnegie-Illinois Steel Corp. v. Review Board (1947), 117 Ind. App. 379, 72 N.E.2d 662, quoted by the majority opinion, nowhere requires such curtailment "to be controlled."
Further, there is no specific finding or conclusion with reference to whether or not the four plants here involved do or do not fall within the definition of "establishment" as that term is used in the statute. The Statement of Facts made by the Board would support either view on this issue.
The majority opinion alludes to Conclusion No. 5 of the Board as supporting an ultimate conclusion that there was no "work stoppage." As heretofore stated, that evidentiary conclusion merely indicates that there was no controlled curtailment of production. The majority opinion thus appears to insert an additional and unwarranted element into the definition of "work stoppage" as it exists in Indiana. Such requirement is, in my opinion, contrary to the logic and purpose of the compensation law in that production curtailment flowing naturally and necessarily from a labor dispute often times designedly precludes manipulative efforts and controls.
On the whole, it would appear either that the Board misinterpreted the law of Indiana with reference to requisite Statement of Facts, Findings and Conclusions, or that it *295 desired as a matter of equity to achieve a particular result and, therefore, carefully phrased its Findings and Conclusions so as not to conflict with that desired result. For example, the Board in its Statement of Facts stated that there was no complete shutdown except due to strikes on local issues. This indicates that the Board either felt that a complete shutdown was necessary in order to meet the "work stoppage" test, in which case it misinterpreted or ignored the law of Indiana as set forth in Blakely v. Review Board (1950), 120 Ind. App. 257, 90 N.E.2d 353, and Carnegie-Illinois Steel Corp. v. Review Board, supra; or it wished to avoid application of the established criteria for determining "work stoppage" in order not to set forth an open and obvious conflict between the Findings and Conclusions, and the ultimate decision.
Appellees in their briefs properly paraphrase each of the contentions made by appellant in its brief. During oral argument, however, appellant injected a public policy consideration deserving of comment here. Appellant argued that state funds in the form of compensation benefits should not be made available to unions in such a manner as to constitute a subsidy to selective strike activity such as here conducted. In this connection, it was the substance of appellees' argument that even if the union did, in fact, utilize the "selective strike" method for maximum negotiating leverage upon the entire General Motors operation and even if the union did so with the knowledge and expectation that certain non-striking employees, arbitrarily selected by the union, as here, could draw financial assistance in the form of unemployment benefits, thereby decreasing the adverse effect of the labor dispute upon such employees, such does not alter the fact that union conduct of this sort is not statutory cause for benefit ineligibility. Appellees stated that if the labor strategy of this sort is deemed an evil it is for the legislature to so declare and to remedy that evil by statutory amendment. While I recognize the very real public policy consideration in this respect I tend strongly to agree with appellees that we can *296 no more judicially legislate or implement what we think public policy should be in this regard, than we can arbitrarily, dehors the record, attribute to the union the "evil" motives hereinabove referred to.
For the reasons hereinabove set forth, I concur only in the result reached by the majority in its opinion.
NOTE.  Reported in 255 N.E.2d 107.
NOTES
[1] In this regard Carlton v. Board of Zoning Appeals (1969), 252 Ind. 56, 245 N.E.2d 337; Kosciusko County v. Public Service Commission (1948), 225 Ind. 666, 77 N.E.2d 572; and Block v. Fruehauf Trailer Division, Fruehauf Corp. (1969), 146 Ind. App. 70, 252 N.E.2d 612, are clearly distinguishable in that they involve an appeal from an award in favor of the party having the burden of proof. Compare Department of Financial Institutions v. State Bank of Lizton (1969), 253 Ind. 172, 252 N.E.2d 248.
[2] This Rule makes no distinction between negative and affirmative awards.