NORTHWEST AIRLINES, INC., *v.* EMPLOY-
MENT SECURITY COMMISSION.

DECISION OF THE COURT.

1. UNEMPLOYMENT COMPENSATION—STRIKE BY FLIGHT ENGINEERS—
GROUND PERSONNEL.

Determination of the appeal board of the employment security
commission granting unemployment compensation to claimant
ground personnel at airport and ticket office of airline whose
flight engineers had struck and caused layoff of claimants,
which had been reversed by circuit court, is ordered reinstated
on remand (CLS 1961, § 421.29).

SEPARATE OPINION.

T. M. KAVANAGH, C. J., and SOURIS, SMITH, and ADAMS, JJ.

2. APPEAL AND ERROR—QUESTIONS REVIEWABLE—SUBSEQUENT AMEND-
MENT TO STATUTE.

*Statutory amendments, adopted after alleged cause of action for
unemployment benefits had arisen, are not applicable to the
case and, therefore, not discussed (CLS 1956, § 421.29, as
amended by PA 1963, No 226).*

3. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS
—ESTABLISHMENT.

*The term* establishment, *as used in provision of employment secu-
rity act relative to disqualification for unemployment benefits
"because of a labor dispute in establishment in which he is or*

REFERENCES FOR POINTS IN HEADNOTES

[1, 3–6, 9, 10] 48 Am Jur, Social Security, Uuemployment Insurance,
and Retirement Funds § 36.
Construction and application of provisions of unemployment com-
pensation or social security acts regarding disqualification for
benefits because of labor disputes or strikes.   28 ALR2d 287.
[2]   50 Am Jur, Statutes § 467.
[7, 8]  48 Am Jur, Social Security, Unemployment Insurance, and
Retirement Funds §§ 46–50.

*was last employed," has reference to a distinct physical place of business, necessarily localized in character (CLS 1956, § 421-.29).*

4. SAME—DISQUALIFICATION FOR BENEFITS—STRIKE BY FLIGHT ENGINEERS—CLAIMS BY GROUND PERSONNEL.

*Ground personnel at airport and ticket office who were unemployed because of strike of flight engineers, employed by same employer, were not disqualified from benefits by reason of such labor dispute by flight personnel, the term establishment not embracing the flight personnel of the airline, where the primary service of the flight engineers, hired out of the State, appears to be rendered while the aircraft is in flight, they are not considered in the Michigan employment count for tax purposes under the employment security act, no report is made to this State of their wages, the aircraft were not stored in this State, and the flight engineers were neither based nor domiciled in this State notwithstanding they performed some service in this State and were temporarily under control of an operations manager while here (CLS 1961, § 421.29).*

5. SAME—DISQUALIFICATION FOR BENEFITS—ESTABLISHMENT.

*Functional integrality, general unity, and proximity, tests derived from manufacturing industries, are only some of the factors in a test applied in interpreting the term establishment in employment security act in a case involving the airline industry, which is greatly different in organization and purpose (CLS 1956, § 421.29).*

6. SAME—LABOR DISPUTE—DIRECT INVOLVEMENT—DISQUALIFICATION FOR BENEFITS.

*Direct involvement in a labor dispute within the establishment in which a claimant for unemployment compensation is employed is a test for disqualifying a claimant only after it is first established that the stoppage of work is due to a labor dispute in the same establishment as that in which the claimant is employed (CLS 1961, § 421.29).*

SEPARATE OPINION.

BLACK, J.

7. UNEMPLOYMENT COMPENSATION—FINDER OF FACTS.

*The appeal board of the employment security commission is the final finder of facts under the employment security act, and its findings will be undisturbed on appeal if supported by sufficient proof to justify its findings (CL 1948 and CLS 1961, § 421.1 et seq.),*

8. SAME—QUESTION OF LAW—SEPARATE ESTABLISHMENT.

*Holding of appeal board of employment security commission that claimants, ground personnel at airport and ticket office, were employed "at a separate establishment" from the striking flight engineers* held, *a question of law, which was justified by the findings of fact by the board, and by prior decision of this Court (CLS 1961, § 421.29).*

DISSENTING OPINION.

DETHMERS, KELLY, and O'HARA, JJ.

9. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS —STRIKE BY FLIGHT ENGINEERS—CLAIMS BY GROUND PERSONNEL— SYSTEMWIDE ESTABLISHMENT.

*Ground personnel at airport and ticket office who were out of work because of strike of flight engineers, employed by same employer but based in other States, were disqualified from benefits by reason of the strike, since claimants had systemwide seniority, belonged to a systemwide bargaining unit, and were employed at a systemwide establishment (CLS 1961, § 421-.29).*

10. SAME—CLAIMANTS REPRESENTED BY STRIKING UNION—DISQUALIFICATION FOR BENEFITS.

*Ground personnel at airport and ticket office who were out of work because of strike of flight engineers and who were represented by the same union for bargaining purposes, were disqualified from benefits by reason of the strike, since such claimants both financed the dispute and were directly interested in the dispute as the strike fund was supported by contributions of each member independently of dues (CLS 1961, § 421.29).*

Appeal from Ingham; Hughes (Sam Street), J. Submitted October 6, 1965. (Calendar Nos. 3–5, Docket Nos. 51,033, 51,242, 51,243.) Decided June 8, 1966.

Certiorari by Northwest Airlines, Inc., against Employment Security Commission, Richard L, Streit, Miriam E. Huntoon, Lawrence Kelly, and others to review decisions of board granting unemployment benefits to Richard L. Streit and others. Reversed and benefits denied. Claimants Richard

L. Streit and others appeal on leave granted. Reversed. Decision of appeal board of employment security commission reinstated.

*Miller, Canfield, Paddock and Stone (George E. Bushnell, Jr., Emory T. Nunneley, Jr., and James A. Abbott, of counsel), for plaintiff.*

*Rothe, Marston, Mazey, Sachs & O'Connell (William Mazey, of counsel), for defendant claimants.*

SMITH, J. The principal issue in this case is similar to the principal issue decided in the so-called "Ford-Canton" case: *Park v. Employment Security Commission*, 355 Mich 103. Claimants are Michigan-based employees of Northwest Airlines who were laid off from work as a result of a strike by flight engineers who were domiciled in Minneapolis and Seattle, but who were attached to aircraft which flew from place to place throughout the airline system. Federal aviation regulations required such engineers to be on board aircraft during flight. When the flight engineers went on a systemwide strike January 9, 1961, the flight operations of Northwest in Michigan and elsewhere were closed down and certain ground personnel, including claimants herein, were laid off by management.[*] Generally stated, the question has to do with whether or not the labor dispute which resulted in claimants' unemployment was "in the establishment" where they were employed.

The parties agreed to a "statement of proceedings and facts" in the Ingham circuit court, which court

---

[*] As will be seen from the "statement of proceedings and facts," some of the claimants are members of the same union, International Association of Machinists, as the flight engineers, while other claimants are members of 2 other unions: Brotherhood of Railway and Steamship Clerks and the Communications Workers of America.

had initial appeal jurisdiction from the employment security appeal board. Such statement having been concurred in again by the parties in this Court, and it being a fair summation of the case, is adopted here:

"Claimants are individuals who were employed by Northwest Airlines, Incorporated, at the Detroit Metropolitan Airport and at the Northwest Airlines office in the city of Detroit.

"On the 9th day of January, 1961, the claimants were advised by Northwest Airlines, Inc., that due to a strike of flight engineers that they would be laid off until further notice.

"The claimants filed claims for unemployment benefits under the Michigan employment security act. The commission filed a redetermination on September 8, 1961, holding that the unemployment of the claimants was due to a stoppage of work in the establishment in which they were last employed and held that the claimants were disqualified from receipt of benefits for the same period of their unemployment under the labor dispute provision, section 29(1)(b)(4) of the Michigan employment security act.

"The claimants filed appeals from the redetermination to a referee who, on August 27, 1962, issued a decision holding that the claimants were not entitled to benefits.

"The claimants appealed this decision to the appeal board of the Michigan employment security commission and on January 4, 1963, the appeal board reversed the decision of the referee and held that the claimants were eligible for benefits.

"Northwest Airlines, Inc., filed an appeal to the circuit court for the county of Ingham. On April 29, 1964, the Honorable Sam Street Hughes filed a written opinion holding that the claimants were ineligible for benefits as a matter of law; a copy of the opinion being attached hereto as exhibit A.

"On May 28, 1964, judgment was entered by the Honorable Sam Street Hughes reversing the decision of the appeal board.

"The issue in this case is whether, under section 29(1)(b) of the Michigan employment security act, the unemployment of the claimants was due to a stoppage of work existing because of a labor dispute in the establishment in which they were last employed.

"Northwest Airlines, Incorporated, is a common carrier by air in interstate and foreign commerce, operating foreign and scheduled air service under authority of the civil aeronautics board.

"Northwest domestic service connects the Pacific northwest cities of Seattle, Tacoma, Portland, with New York, and Washington via Detroit, Chicago, Minneapolis, St. Paul and Spokane. The trunk portion of the system consisted of the mainline between New York and Seattle with segments off the main trunk to Washington, to points in Florida, and to Winnipeg, the Orient, Alaska, and Hawaii.

"The company operations involved centralized dispatching of planes and a centralized electronic reservation system, high line telephone, teletype and meteorology service.

"Prior to January 9, 1961, regularly flying in and out of the Detroit Metropolitan Airport, the flight engineers were performing services. These services were subject to the direction and control of the captain, both when the planes were en route and when they were landing and take-off, including assisting the pilot in phases of the landing and take-off such as monitoring certain instruments pertaining to the performance of the engine of the aircraft aboard the aircraft, and just prior to take-off making what was known as a walk around check at the airport prior to its departure. Flight engineers were subject to the direction and control of the company's operations manager in Detroit while such flight engineers laid over between flights at that location.

"On January 9, 1961, in the course of a labor dispute, the flight engineers unqualifiedly refused to fly any of the company's aircraft to or from any point in the company's entire route system in the continental United States, including the Detroit terminal. This resulted in the complete cessation of operations in Michigan by Northwest Airlines because of the fact that flight engineers who refused to fly were all licensed by the federal aeronautics administration, and such licensed personnel were required by regulation to operate Northwest aircraft. Northwest did not have other replacement personnel available to fly the flights scheduled into and out of Michigan, and, therefore, the flights were grounded as a result of the strike. As a consequence, Northwest employees were given a temporarily no work notice.

"The issues involved in the labor dispute solely concerned the status of the company's flight engineers. Northwest, on January 9, 1961, had 82 employees on its Michigan payroll, none of whom were flight engineers. None of the flight engineers were based or domiciled in Michigan. The domicile of the flight engineers was either at Minneapolis, Minnesota, or Seattle, Washington. No aircraft was stored in Michigan.

"The company had an operations manager in Detroit who might and did recruit employees. Prospective employees might be interviewed in Minneapolis or locally by an interviewer from Minneapolis, or by a local interviewer, but their ultimate employment was subject to approval by the director of employment at Minneapolis.

"The local manager could not discharge a worker for an infraction of rules until a hearing was held with a final decision being made normally with the manager's recommendation to the company. In the case such as theft, the manager could directly discharge the employee.

"The payroll department for the entire system was located in Minneapolis. All time cards were

checked by the local manager and forwarded to Minneapolis for compiling and for payment. All payroll checks were drawn on the First National Bank of Minneapolis; these being forwarded to the various points of the company's system around the country.

"For the purpose of union representation the entire system was treated as a single bargaining unit. Thus the flight engineers were represented by the International Association of Machinists. The district lodge of that union at Minneapolis represented all employee members wherever they might be located in the system and negotiated systemwide rather than local agreements with the company. There were no local labor-management agreements and local employees in Michigan were covered by systemwide agreements which provided systemwide seniority. Employees, regardless of location, have systemwide seniority and are promoted, demoted, or laid off based on systemwide seniority.

"The claimants are variously represented for collective bargaining purposes by International Association of Machinists, Brotherhood of Railway & Steamship Clerks and by the Communications Workers of America. The constitution of the Grand Lodge of the International Association of Machinists provides for a strike fund from which the striking flight engineers drew benefits. The International Association of Machinists' constitution further provides that 50¢ per month is assessed against each member for the support of his local or district lodge, and is specifically earmarked for inclusion in the strike fund.

"Claimants who are members of the International Association of Machinists did not pay union dues during the period of their lay off. They did not receive strike benefits.

"There was no picketing by anyone at the place of employment of the claimants, the Detroit Metropolitan Airport.

"Northwest Airlines pays unemployment taxes on behalf of the claimants to the State of Michigan. Northwest pays unemployment taxes on behalf of its flight engineers to the State of Minnesota."

The appeal board said, "We do not believe that these flight engineers became employed at the facilities at Detroit Metropolitan airport within the meaning of the act any more than they are attached to any 'establishment' in a State over which they fly without landing, simply because of services performed in flight." Later, the appeal board stated in its opinion that "We therefore conclude that, as a matter of law, the claimants in the instant appeal were employed at a separate 'establishment' than that in which the stoppage of work, due to a labor dispute by flight engineers, existed."

In reversing the decision of the appeal board, the Ingham circuit court held "that the decision of the appeal board is erroneous, as a matter of law."

Both appellants and appellees agree that the principal issue is whether or not the labor dispute which caused the unemployment of the claimants occurred *in the establishment* in which the claimants were employed.

Decision in this case turns on the application of principles enunciated in *Park* v. *Employment Security Commission, supra,* as that case interpreted statutory language, particularly what constitutes a labor dispute "in the establishment." Said statutory provisions are the same as they were in the *Park Case;* however, since the *Park Case* (1959), and since the 1961 dispute giving rise to the present action, the statute in question has been amended by PA 1963, No 226. Obviously, the amendments do not apply in this suit and, therefore, will not be discussed.

The pertinent section of the statute up for review is as follows:

"Sec. 29. (1) An individual shall be disqualified for benefits: * * *

"(b) For any week with respect to which his total or partial unemployment is due to a stoppage of work existing because of a labor dispute in the establishment in which he is or was last employed * * * ." CLS 1956, § 421.29 (Stat Ann 1960 Rev § 17.531).

Although the statute contains no definition of what constitutes "in the establishment," that expression was fully explored and defined in *Park* v. *Employment Security Commission, supra.*

In *Park,* where a strike in Ford's Canton, Ohio, plant resulted in the layoff of Ford employees in three Michigan plants in the Detroit area, this Court held erroneous, as a matter of law, a finding that (p 130) "all of the units of the Ford Motor Company, both in Michigan and Ohio, constituted 1 establishment within the meaning of that word as contained in the Michigan act." This Court held that the term "establishment", as used in the provision of the employment security act relative to disqualification for unemployment benefits "because of a labor dispute in the establishment in which he is or was last employed", has reference to a distinct physical place of business. The Court specifically rejected the company's suggestion that "establishment" is synonymous with "employing unit", a term which *is* defined in the act and which, from the discussion in *Park,* clearly carries a broader application than the term "establishment." (p 117)

The Court also rejected (p 125) "functional integrality, general unity, and physical proximity * * * as an absolute test." It adopted language which left no doubt that although these are some

of the factors to be considered in determining when a factory, plant or unit is a separate establishment, other facts (p 127) "must be taken into consideration in determining whether the unit under consideration is in fact a separate establishment from the *standpoint of employment.*" (Emphasis supplied.)   *Park, supra,* quoting with full approval *Nordling* v. *Ford Motor Company,* (1950), 231 Minn 68 (42 NW2d 576, 28 ALR2d 272).

The *Park Case* thus defined "establishment" in terms of a distinct physical place of business, necessarily localized in character.   In so deciding, *Park* placed substantial reliance upon *Nordling* v. *Ford Motor Company, supra,* which posed a similar problem.   *Nordling* held that a determination of whether a unit of employment is a separate "establishment" within the meaning of the disqualifying provisions of their employment security law must be based *upon all the facts relating to the relationship of the employee to the unit of employment,* rather than on a determination of whether an entire enterprise or industry is highly integrated as to operating units or unified for the purpose of efficient management or production.   See number 5 of the syllabus by the court in *Nordling.*   This analysis is a sound and helpful approach to the problem of applying the facts, which in the instant case are not in dispute, to the statutory principle involved in this lawsuit.

We recognize first that the test of functional integrality, general unity and proximity, which has so often been used and debated in connection with "establishment" cases (see cases discussed in *Park*), grew out of problems in industries vastly different from the airline industry.   Nearly all such cases involved manufacturing industries, especially automotive, with different sets of operating character-

istics. In manufacturing, the employees are stationary in fixed plant locations, and the products, in various stages of production, move from plant to plant in a highly synchronized manner. The airline industry is, of course, greatly different in organization and purpose. It transports persons and cargoes from place to place and in providing such service employs two distinct kinds of personnel: flight personnel and ground personnel. The ground personnel are located at fixed terminals and offices, while the flight personnel perform their essential functions in connection with the actual flight of aircraft, although some flight personnel perform functions on the ground at various terminal points.

We come down to the question, then, in this case that where, as here, part of the flight personnel (flight engineers) are involved in a labor dispute with management and certain ground personnel are laid off by management as a result, said ground personnel having no dispute with management, is the labor dispute of the flight engineers "in the establishment" of the ground personnel claimants employed at the Detroit Metropolitan Airport and the Detroit ticket office of Northwest?

Following our interpretation in *Park* of what constitutes an "establishment", that is, a distinct physical place of business local in character, and approaching the fact tests of *Park* and *Nordling* from the stipulated record, we conclude that the labor dispute of the flight engineers did not occur in the establishment of claimants, hence they are not disqualified from unemployment benefits. The analysis of the appeal board is consonant with the broad criteria laid down in the *Nordling Case* and adopted in *Park,* and is therefore relevant at this point:

"The transcript of testimony discloses that, when the aircraft arrived at Detroit metropolitan airport,

the flight engineers usually walked around the plane in order to examine it in some respect and, also, perhaps employed their skills in some manner while the plane was being serviced and while passengers were either deplaning or emplaning. *However, the primary service of the flight engineers appears to be rendered while the aircraft is in flight.* For these services, the flight engineers are subject to the flight captain aboard the ship. Can it be said that these flight engineers were employed at the Michigan facility? Here again, the nature of the transportation industry is such that those who employ their skill do so from place to place and it is urged that they are employed at each point along the route. We believe that such type of service is employment at each point along the route in a very literal sense. The question before us, however, is whether or not we have such employment under the terms of our employment security act. We do not believe that these flight engineers became employed at the facilities at Detroit Metropolitan Airport within the meaning of the act any more than they are attached to any 'establishment' in a State over which they fly without landing, simply because of services performed in flight. It is to be noted that the flight engineers are not considered in the Michigan employment count for Northwest Airlines Incorporated's taxes under the act, and no report is made to Michigan of their wages. It follows that these flight engineers could not file claims for unemployment benefits under our act and it appears, from the record, that a number of the flight engineers filed for unemployment benefits in Minnesota. We therefore do not believe that there is any sound basis in the record to consider these flight engineers as having had a labor dispute at a Michigan 'establishment.' " (Emphasis supplied.)

To this analysis, we would add the following from the stipulated record. The flight engineers on strike were neither based nor domiciled in Michigan, they

were domiciliaries of either Minneapolis, Minnesota, or Seattle, Washington. None of the aircraft to which they were attached was stored in Michigan. The services performed by the flight engineers were under the direction and control of the captain of the aircraft; although, in the event of a layover in Detroit, the flight engineers would come under control of the Detroit operations manager while in Detroit. The operations manager is, as his title implies, in charge of the Detroit operation, including the ground personnel therein.

The referee, in his opinion, sought to distinguish this case from the *Park Case* by showing that in the *Park Case* there were "localized employment conditions" whereas in this case "the employer's [Northwest] airline system is highly integrated with all units along its route, not only for the purposes of management and operation, but for employment purposes as well." He then goes on to explain his point by repeating that Northwest employees are hired under systemwide collective bargaining agreements and that, although employees may be hired by local units, the central control is maintained by management at company headquarters in St. Paul. The same point is substantially repeated in the opinion of the circuit judge in his review. We think the emphasis was misdirected and, therefore, led to the error in decision.

The *Park Case* directs us to look first to the ordinary definition of the word "establishment." In this connection, the controlling opinion in *Park* instructively comments as follows: (p 116)

"Judges and lawyers can frequently do astonishing things with words. No layman would venture to suggest the single word 'establishment', * * * could in normal usage be applied to both the Ford Rouge plant in Dearborn, Michigan, and the Ford forge plant in Canton, Ohio. * * *

"No layman without a specific motive in mind, would read the statutory provisions quoted above and come to the conclusion that the legislature had any such inclusiveness in its intended use of the word."

This returns us to the simple definition which was adopted in *Park* that an "establishment," within the meaning of the statute, is a distinct physical place of business, local in character. But definitions alone do not suffice when we are faced with the necessity of analyzing the highly complex relationship of the local employee to his employer, a multi-faceted, international business organization. The *Park Case* then commands us to look not alone to functional integrality, general unity, and physical proximity as a test but to other factors as well, *from the standpoint of the worker's employment.*

In view of the broad test laid down in *Park,* we think that the referee and the able circuit judge placed too heavy emphasis upon the systemwide collective bargaining agreements and central control of personnel. These are factors to be considered, neither more nor less meaningful than other factors present in the case such as the transitory nature of the flight engineers' work contrasted with the local character of claimants' work. If we were to affirm the referee and the circuit judge we would be placing undue emphasis upon the systemwide personnel and union procedures of Northwest which cannot be decisive in determining what was the character of the local workers' employment and the character of the place in which it was performed.

The fact that there was a centralized payroll department and certain basic controls of employees from the Northwest headquarters in Minneapolis do not detract from the distinctly local character of the establishment in question. Nor do we per-

ceive that because the flight engineers performed
some part of their function on the ground in Detroit
the character of the Detroit operation was thereby
altered so as to place the labor dispute in the local
establishment.

Northwest also argues that those of the claimants
who belong to the same international union (International Association of Machinists), as do the flight
engineers, should also be disqualified for the reason
that by the payment of union dues prior to the
strike, a portion of which went into a strike fund, the
claimants had "financed the labor dispute which
caused the stoppage of work as contemplated in
Section 29(1)(b)(2) of the Michigan employment
security act:

" '(2) That he is * * * financing * * * the
labor dispute which caused the stoppage of work;
* * * .' "

The brevity of the quotation in this argument makes
it necessary to quote somewhat at greater length
from the portion of the statute from which the quotation was taken. It read as follows:

"Sec. 29(1)    An individual shall be disqualified
for benefits:    * * *

"(b) For any week with respect to which his total
or partial unemployment is due to a stoppage of
work existing because of a labor dispute in the establishment in which he is or was last employed:
*Provided, however, That no individual shall be disqualified under this section if he shall establish that
he is not directly involved in such dispute. For the
purpose of this section, no individuals shall be
deemed to be directly involved in a labor dispute
unless it is established:* * * *

"(2) That he is participating in or financing or
directly interested in the labor dispute which caused
the stoppage of work: Provided, however, That

the payment of regular union dues shall not be construed as financing a labor dispute within the meaning of this subsection." Michigan employment security act, CLS 1956, § 421.29 (Stat Ann 1960 Rev § 17.531).   (Emphasis supplied.)

In interpreting the application of the proviso (to which emphasis has been supplied), this Court has already ruled contrary to the argument made by Northwest.   In *Park,* at page 131, we said that "the basic disqualification finding required in the first sentence of section 29(1)(b) must be legally made before the proviso relating to 'direct involvement' becomes effective, and before considering or applying the tests of direct involvement set forth in subsections 1, 2, 3 and 4."   This means simply that it must first be established the stoppage of work was due to a labor dispute "in the establishment" before the tests of direct involvement, set forth in subsections 1, 2, 3 and 4, can be applied.   Having already decided that the labor dispute was *not* in the establishment, the proviso plainly does not apply.

The judgment of the Ingham circuit court is reversed as a matter of law, and upon remand the decision of the appeal board will be reinstated. Costs to appellants.

T. M. KAVANAGH, C. J., and SOURIS and ADAMS, JJ., concurred with SMITH, J.

BLACK, J. (*concurring in reversal*).   The appeal board's decision is sufficiently outlined in Justice SMITH's opinion.   The board is the final fact-finder under the statute, and I find no serious claim that the board did not have before it sufficient proof to justify its factual findings.   This leaves only the question, one of law, whether such findings justified the board's determination that these claimants were employed "at a separate 'establishment'."

Looking at the *Park Case* (355 Mich 103) I hold that the board was so justified. My vote is accordingly cast to reverse and remand for entry of order affirming the appeal board's decision.

Kelly, J. (*dissenting*). The trial court correctly stated that "since the factual aspects are not in question, adjudication of the issue presented requires only the proper application of the law to the facts."

The five attempts to apply the law have resulted in three decisions[1] that claimants are disqualified from receiving benefits for the period of unemployment and two decisions[2] that claimants are not disqualified.

In this dissent from Justice Smith's opinion I am joining the three who have decided that claimants are disqualified.

My Brother agrees with the appeal board that *Park v. Employment Security Commission*, 355 Mich 103, is a precedent for allowing benefits to present claimants.

I agree with the referee and the trial court that *Park* serves no such purpose.

In the *Park Case* the majority opinion stressed the fact that while functional integration of and by itself would not disqualify claimants, there were other factual criteria that should be examined, and stated (pp 120, 121):

"The record in the cases considered herewith indicates for all plants concerned entirely separate and distinct plant managements and plant production schedules, as well as separate and distinct industrial relations and employment offices, employee seniority lists, local unions, and local labor-management agreements."

[1] The commission, the referee, and the trial court.
[2] Mr. Justice Smith and the appeal board.

To emphasize that point the *Park* decision quoted
with approval the Minnesota supreme court deci-
sion in *Nordling* v. *Ford Motor Co.,* 231 Minn 68
(42 NW2d 576, 28 ALR2d 272), which, after making
reference to the fact that functional integrality,
general unity and physical proximity are not abso-
lute tests in all cases, stated (p 127):

" 'We believe the better rule to be that these fac-
tors, together with other facts, must be taken into
consideration in determining whether the unit under
consideration is in fact a separate establishment
from the standpoint of employment. The St. Paul
branch of the Ford Motor Company is highly inte-
grated with other units of the company for purposes
of efficient management and operation, but is sepa-
rate insofar as the employees are concerned for the
purpose of employment. The employees are hired
and discharged by the St. Paul manager. They are
members of a local union which has no connection
with the locals at Dearborn, except that all locals
are members of the same international, as are many
others not connected with the Ford Motor Company.
The seniority rights of the employees extend only
to operations at the St. Paul plant. No showing has
been made, nor do we believe that any can be made,
that an employee at the St. Paul branch can "bump"
an employee at the Rouge plant, the Los Angeles
plant, the Georgia plant, or anywhere else than at
the St. Paul plant.' "

The following five quotes from the agreed "State-
ment of Proceedings and Facts," as set forth in my
Brother's opinion, disclose that not only are facts
absent in the present case that were deemed im-
portant in granting claimants' request in *Park,* but
that facts exist in this appeal that are completely
opposite to the facts in *Park* and contrary to grant-
ing claimants' request:

138      578 Mich 119.      [June

1. "For the purpose of union representation the entire system was treated as a single bargaining unit."

2. "There were no local labor-management agreements and local employees in Michigan were covered by systemwide agreements which provided systemwide seniority. Employees, regardless of location, have systemwide seniority and are promoted, demoted, or laid off based on systemwide seniority."

3. "The company had an operations manager in Detroit who might and did recruit employees. Prospective employees might be interviewed in Minneapolis or locally by an interviewer from Minneapolis, or by a local interviewer, but their ultimate employment was subject to approval by the director of employment at Minneapolis."

4. "The local manager could not discharge a worker for an infraction of rules until a hearing was held with a final decision being made normally with the manager's recommendation to the company. In the case such as theft, the manager could directly discharge the employee."

5. "The payroll department for the entire system was located at Minneapolis. All time cards were checked by the local manager and forwarded to Minneapolis for compiling and for payment. All payroll checks were drawn on the First National Bank of Minneapolis; these being forwarded to the various points of the company's system around the country."

The appeal board took the position that it was not necessary to determine the flight engineers' establishment, and appellee comments on that fact as follows:

"The board, by rejecting appellee's arguments with respect to the Michigan establishment and by rejecting appellee's arguments with respect to a system establishment, left the flight engineers 'in the air,' as it were, without any establishment. Such

an absurd and afforced result demonstrates the fallacy of the board's decision."

   Northwest Airlines scheduled 21 flights daily into the Detroit Metropolitan Airport and under Federal regulations no landing or take-off could be made without a flight engineer aboard.

   Northwest Airlines had 34 airport locations within the United States, and each of these geographical locations was an integral part of the entire system of operation.

   The flight engineers, who were important employees in conducting the planes from one location to another, performed work at all locations,[3] and the entire system was "the establishment" of the flight engineers.

   The ground force, of which claimants were part, and the "sky force," of which the flight engineers were an important part, depended upon each other to make the joint endeavor a successful financial venture. When the flight engineers struck there was nothing for claimants to do and this fact is aptly set forth in appellee's brief, as follows:

   "The work of the claimants-appellants consisted of selling space aboard the aircraft that serviced the Detroit area. This space was sold to passengers and shippers. In addition, the claimants-appellants were responsible for loading and unloading the aircraft, making reservations, preparing tickets, receiving, checking and otherwise processing incoming and outgoing baggage, freight, mail and express. The work of the claimants-appellants abutted the work of the flight engineers directly at the aircraft itself. The work of each complemented the work

   [3] From the decision of the appeal board: "The transcript of testimony discloses that, when the aircraft arrived at Detroit Metropolitan Airport, the flight engineers usually walked around the plane in order to examine it in some respect and, also, perhaps employed their skills in some manner while the plane was being serviced and while passengers were either deplaning or emplaning."

of the other, and the work of both was essential to
the conduct of the appellee's business in the Detroit
metropolitan area.

"In essence and in fact, the striking flight engi-
neers were employed side by side with claimants-
appellants prior to the strike. And this is the dis-
tinguishing feature that applies to each and every
decision cited by claimants-appellants for authority
for their position. In each of those cases there was
*no work contact* between the striking employees
and those employees who were making claim for
compensation."

That the referee realized the importance of the
factual criteria, namely: (1) Whether a local or
systemwide seniority list prevailed; and (2) Wheth-
er there were local unions and local labor-manage-
ment or union representation, with the entire system
being treated as a single bargaining unit, is dis-
closed by the following from the referee's opinion:

"Applying the various tests laid down by the
Court in *Park* to the facts of the case at bar, im-
portant and salient distinctions in the factual situa-
tions are immediately apparent: Unlike the situa-
tion referred to in the Minnesota decision with
reference to the St. Paul plant of the Ford Motor
Company, and likewise, in contradistinction of the
factual situation reflected in *Park*, with reference
to localized employment conditions at the Ford
Motor Company's Canton, Ohio and Dearborn
plants, the facts herein show that the employer's
airline system is highly integrated with all units
along its route, not only for the purposes of man-
agement and operation, but for employment pur-
poses as well. Almost all employees are hired under
systemwide collective bargaining agreements and,
although certain classifications may be recruited
locally, all employment contracts are finalized at the
company's headquarters in St. Paul. Employees
are not members of local bargaining units and, for

the most part, exercised systemwide seniority, both with reference to bumping privileges in times of layoffs as well as bidding privileges for promotional purposes. In short, the indicia marshalled by the decision of the Court point up the dissimilarity in the employment situation of the claimants herein, as contrasted with those found to exist in *Park*. Unlike the Ford-Canton factual situation, where the employees worked at distinct locations, the Northwest Airlines flight engineers worked in each location and throughout each jurisdiction serviced by the company. Therefore, in applying the tests set forth by the Court in *Park* to the facts of the instant case, it is not concluded, as a matter of law, that claimants were employed at a separate establishment from that in which the stoppage of work due to the labor disputes existed.

"In view of the undisputed fact that the flight engineers, prior to the strike, performed daily services at all points of the company's far-flung operations, both within and without the State of Michigan, it must be held, regardless of the fact that flight engineers were not based at the Michigan facility, that a stoppage of work due to a labor dispute existed within the establishment in which the claimants were employed."

The lengthy decision of the appeal board avoided any reference to the question of labor-management relationship or seniority rights despite the fact that the referee had clearly and emphatically stated why he deemed these factual criteria important.

The fact that the trial court considered these questions important is disclosed by the following from the trial court's opinion:

"The court is of the opinion that the commission's conclusion that the case of *Park v. Employment Security Commission*, 355 Mich 103, is controlling of the issues involved in these cases now before this court, is not correct. The *Park Case* deter-

mined that 'integral functioning' was not the basic
test of the extent of 'the establishment' in the act.
The Court, in the *Park Case,* quoted from *Nordling*
v. *Ford Motor Co.,* 231 Minn 68 (42 NW2d 576, 28
ALR2d 272). It was pointed out, in those cases,
that in the Canton plant and the St. Paul plant,
the local management had considerable independent
authority over employees; that local unions repre-
sented the workers; seniority rights were local;
et cetera. The installations of the Northwest Air-
lines, Inc., in Detroit Metropolitan area enjoyed
no such independence. *It could hardly be said that
the claimants were employed at a 'separate estab-
lishment.' They were employed at a systemwide
establishment, as a matter of law.*" (Emphasis
ours.)

I agree with the conclusions of both the referee
and the trial court that the facts that claimants
had systemwide seniority and that they belonged
to a systemwide bargaining unit are most important
in deciding this appeal.

While there was a systemwide bargaining unit,
the 5,740 employees of Northwest were represented
by seven different unions for bargaining purposes.
The flight engineers and some of the claimants be-
longed to the same union, namely, the International
Association of Machinists.

The appeal board in its decision, referring to one
of appellee's contentions, said:

"The employer has contended that, since a por-
tion of the claimants' union dues went into a strike
fund for the flight engineers and from which they
benefited, these claimants are disqualified under
section 29(1)(b)(2) of the act (CLS 1956, § 421.29
[Stat Ann 1960 Rev § 17.531])."

The trial court commented on this in an addendum
to his opinion, as follows:

"The question of the per capita tax of 50 cents per month to provide a strike fund is mentioned in the decision of the appeal board, but was not considered as one of the determining factors in its decision. Counsel for the claimants argues that the per capita tax was a part of the dues and is, therefore, covered by section 29(1)(b)(2) of the act.

"The court is of the opinion that a serious question does exist insofar as the members of the International Association of Machinists are concerned.
\* \* \*

"If these cases should reach our Supreme Court, this question should not be overlooked."

Section 29 lists four reasons why "an individual shall be disqualified for benefits," and after subdivision (1) which refers to "a labor dispute in the establishment in which he was then employed," subdivision (2) provides:[4]

"That he is participating in or financing or directly interested in the labor dispute which caused the stoppage of work: Provided, however, That the payment of regular union dues shall not be construed as financing a labor dispute within the meaning of this subsection."

The appellee, claiming that "the claimants-appellants were directly involved in the labor dispute, within the meaning of the act," states:

"The claimants-appellants who were represented by the International Association of Machinists both financed the dispute and were directly interested in the dispute which caused the stoppage of work under the terms of the collective bargaining agreement between the appellee and the International Association of Machinists, which is contained in

---

[4] See, currently, PA 1965, No 281. (CL 1948, § 421.29 [Stat Ann 1965 Cum Supp, § 17.531]).—Reporter.

the record as exhibit No 18. Each employee covered by that agreement is required to become a member of the International Association of Machinists and to remain a member of that organization in good standing during the term of the agreement. Prior to the strike of January 9, 1961, the International Association of Machinists had, by its constitution, established a general strike fund. This strike fund was supported by the contribution of 50 cents per month per member, in the form of a per capita tax levied against each member in accordance with the terms of the constitution. As such this fund was separate and distinct from the regular union dues which each employee paid to the organization on a monthly basis. Since, by its constitution, the International Association of Machinists earmarked the tax to be placed in the general strike fund to be used solely for the payment of strike benefits, and not be used for any other purpose, the payment of such tax was other than the payment of regular monthly dues. It is undisputed that the striking flight engineers drew strike benefits from the general strike fund. Therefore, claimants-appellants represented by the International Association of Machinists financed the labor dispute which caused the stoppage of work as contemplated in section 29 (1)(b)(2) of the Michigan employment security act:

"'(2) That he is * * * financing * * * the labor dispute which caused the stoppage of work.'"

Without discounting appellee's argument we deem it sufficient to say the joint membership of claimants and engineers in the IAM is one more factor that justifies the trial judge's conclusion that "It could hardly be said that the claimants were employed at a 'separate establishment.' They were employed at a systemwide establishment, as a matter of law."

As the flight engineers were employed at the same systemwide establishment, we agree with the final

paragraph of the opinion of the trial court that "the decision of the appeal board is erroneous, as a matter of law, and should be and the same hereby is reversed; and that the decision of the referee should be and the same hereby is reinstated."

The judgment of the circuit court should be affirmed. Costs to appellee.

Dethmers and O'Hara, JJ., concurred with Kelly, J.