[Civ. No. 24558.   First Dist., Div. One.   Feb. 26, 1968.]

PAUL M. ARTIGUES et al., Plaintiffs and Respondents, v. CALIFORNIA DEPARTMENT OF EMPLOYMENT et al., Defendants and Appellants.

Thomas C. Lynch, Attorney General, and Donald B. Day,
Deputy Attorney General, for Defendants and Appellants.

Levy, DeRoy, Geffner & Van Bourg, Victor J. Van Bourg, and Stewart Weinberg for Plaintiffs and Respondents.

ELKINGTON, J.—The California Department of Employment and the California Unemployment Insurance Appeals Board appeal from a judgment of the superior court in administrative mandamus proceedings taken pursuant to Code of Civil Procedure section 1094.5. The judgment reversed decisions denying certain unemployment insurance benefits to respondents.

The trial court took no testimony. The case was tried on the record of the administrative proceedings.

Since the benefits provided by the Unemployment Insurance Act are ''property rights within the meaning of the term as used in the cases requiring a trial de novo'' the superior court was required to exercise its independent judgment on the evidence. (*Thomas* v. *California Emp. Stabilization Com.*, 39 Cal.2d 501, 504 [247 P.2d 561].) Accordingly, our task on this appeal is to determine whether, disregarding all contrary evidence, there is substantial evidence in support of the trial court's findings. (*Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301, 308 [196 P.2d 20]; 3 Witkin, Cal. Procedure (1954) p. 2489.) We therefore set forth the facts as they were asserted, admitted, or uncontroverted by respondents below.

Respondents are motion picture projectionists who work in San Francisco theaters. They are members of Local 162 of the International Alliance of Theatrical Stage Employees and Motion Picture Operators (hereinafter referred to as the ''union''). The San Francisco Theater Owners Association (hereinafter referred to as the ''association'') had represented San Francisco theater owners, in their relations with the union, for many years prior to the dispute with which we are here concerned.

For several years the union's members had been working under a series of verbal agreements. Negotiations for a written contract were started in June 1963 when a negotiating committee was selected by the union. The theaters, including the Coronet Theater, were represented by the Association. At the outset of negotiations the union was told which theaters were represented by the association. At that time every theater in San Francisco was so represented and written letters of such authorization had been furnished the union. Thereafter, one of the theaters (the Victorian), changed ownership and

withdrew from the association; the union was so notified on November 4, 1964.

Without any success the respective groups had met and negotiated until November 10, 1964. On that date the union by a vote of its members rejected an offer of the employer association.

On November 12 the authorized union negotiating committee again met with the association. The union representatives stated that a request had been made of "the international for strike sanction" which had not yet been received. The association was told "that there could be no guaranty of manning the booths beyond November 13, 1964." The union committee was advised that "if one booth closed, it would be considered a strike against all of the employers who were represented by the group." The association upon being asked which theaters it represented responded by saying they were the same as announced the preceding year when the negotiations started. The union had been notified a week before of the change of ownership and withdrawal of the Victorian. The union files which apparently contained such information were in the union office.

On the evening of November 13, 1964, three men came to the Coronet Theater. They were the president,[1] the business manager[2] and a member of the negotiating committee of the union. The president and business manager had been elected by the union membership during the preceding month. They presented a bargaining agreement to the theater manager and demanded that he sign it. The theater manager having no authority to deal with the union, the chairman of the association's bargaining committee was summoned to the theater. The three men said to the chairman, "unless this document is signed right now, we are going to strike the theater." They were told, "If you strike this theater, you will close every theater in the City of San Francisco." The men walked into the projection room and told the projectionists to leave. Asked why he walked out, one of the projectionists (who was called as a witness by respondents) testified that if the business

[1]The president was respondent Carlos Columbo, here seeking unemployment insurance.

[2]The by-laws of Local 162 provide in part: "It shall be a duty of the Business Manager to act as spokesman for the Local, except as otherwise provided by the Local. He shall, in conjunction with the Executive Board, have a general supervision of the business of the Local. . . . He shall sign, in conjunction with the President and Secretary-Treasurer, all contracts authorized by the Local. . . . He shall be chairman of all contract negotiating committees, unless otherwise ordered by the Local."

manager "comes in and tells you" to shut down the switches and walk out, "That's the law. That is it." His testimony, which was uncontradicted, continued, "We have an understanding that if we have instructions from the business manager or president, we take their orders. They are the ones responsible for the conduct and operation of the union; and when we get orders from them, we do it." At the time of the hearing this witness was himself business manager of Local 162. He further testified that the business manager has authority to tell a union member not to go into a projection booth.

Later, on the evening of November 13, a meeting of the theater owners was held. As a result of that meeting all San Francisco theaters, except the Victorian, were closed.

On November 14 the union was notified by the employers' association that the theaters it represented would be reopened when "there is no picketing at any of them and whenever every one of them is provided with the operating personnel it needs."

Two days later an authorized representative of Local 162 notified the chairman of the association in writing as follows: "Dear Mr. Levin: This will formally notify you on behalf of Local 162 that the lock-out is being protested and *the projectionists at each of the theaters which locked them out* stand ready and willing to man the booths immediately on call of the employers." (Italics added.) The union at no time (prior to the settlement of the entire dispute) offered to allow the projectionists to return to the Coronet Theater without the signing of an individual contract for that theater.

None of the respondents testified as to the issues at the hearing below.

The dispute between the theater owners and the union was settled January 5, 1965 with a contract negotiated by the association for its members. Respondents (who do not include the Coronet Theater projectionists) thereafter claimed unemployment insurance benefits for the period of their unemployment while the theaters were closed.

The Department of Employment after a hearing denied such benefits, concluding that the lockout was a direct and foreseeable result of a selective strike by the union, and that the claimants as members of the union were chargeable with responsibility for the strike within the purport of the unemployment insurance laws. The Unemployment Insurance Appeals Board affirmed the decision of the department. The

administrative mandamus proceedings which resulted in this appeal followed.

Unemployment Insurance Code section 1262 provides: ''An individual is not eligible for unemployment compensation benefits, and no such benefits shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed.''

*Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935], announced a ''volitional test.'' It held that section 1262 applies only to workers who ''voluntarily'' leave their work because of a trade dispute. Later the Supreme Court declared the policy of the Unemployment Insurance Act as one of neutrality in trade disputes, designed to insure that the payment or withholding of benefits will not be used to aid either party in such a dispute. (*Ruberoid Co.* v. *California Unemp. Ins. Appeals Board*, 59 Cal.2d 73, 77 [27 Cal. Rptr. 878, 378 P.2d 102].)

In *McKinley* v. *California Emp. etc. Com.*, 34 Cal.2d 239 [209 P.2d 602], the employers were organized into a collective bargaining group. It was made clear that ''economic action by either side, whether strike or lockout, would be considered by each of the parties as action against the entire group struck or locked out.'' The court stated (pp. 244-245):

''The selection of a certain plant or plants for a shutdown by strike at a particular time was a mere matter of strategy in the conduct of the trade dispute which equally involved all of the bakeries and their employees. This, in effect, applied the union's economic sanctions against each employer and brought about the unemployment of all of its members. Had the association acted first by closing down one of the member plants and the union followed with a strike against all of the remaining plants, it would be equally clear that the volitional act causing unemployment was the initial shutdown.

''Either the union or an individual employer, at any time, could have broken off joint negotiations and bargained with its employees on an individual basis. But that course was not taken. At no time did the union purport to be directing any action solely against the Butter Cream plant; instead, the union continued throughout to deal directly with the association for the purpose of obtaining a new master contract. To ·say, therefore, that the act of striking the one plant did not

shut down work in other plants of the association which were subject to the labor negotiations for the purpose of obtaining a master contract is wholly unrealistic. Industry-wide negotiations had been established by these employers and consistently carried on for over 10 years. . . . In this case the union members knew from letters and statements as well as from prior strike action that any strike during negotiations would result in stoppage of all work. . . .''

In *Gardner* v. *State of California*, 53 Cal.2d 23, 27 [346 P.2d 193], the court reconsidered *McKinley, supra*, stating: ''This determination [of the trial court] is correct unless we are to overrule the McKinley case and overrule, disapprove or distinguish the other cited cases. Here as in McKinley, the unions had voted to strike against the entire industry and the executive board was authorized (in the language of the appeals board's decision) 'to call a strike if and when and against whom it determined to be to the best advantage of the union'; the objective sought to be accomplished by the strike was the making of certain changes in the master collective bargaining agreement, which changes would affect all association members and their employes; furthermore, as in McKinley, the unions were aware of the policy of the employers, acting through their association, that a called strike against one would be considered a strike against all. Obviously here, as in McKinley, the unions could foresee that the strategy of implementing the strike against less than all members might result in termination of the employment of employes of the other members, and that their consequent unemployment would, under the currently established rule, be regarded as voluntary and thus a bar to benefits. As in *Thomas* v. *California Emp. Stabilization Com.* (1952) 39 Cal.2d 501, 504-506 [247 P.2d 561], the only reasonable conclusion consistent with the volitional theory, as it is accepted and applied in this state, is that the claimants were out of work after the lockout because of their own conduct and that of their authorized unions.''

██ In the case before us the union members had voted for a strike sanction. Their elected and authorized representatives informed the employer association that no assurance could be given that the booths would be manned after November 13. This, under the circumstances, can only be construed as a threat of a strike. The union was informed that a strike against one member theater would be considered as a strike against all. As threatened, the union's business manager who

was authorized to call a strike, and its president, did call a strike against a member theater. The strike must be deemed to have been ratified by the union when two days later it announced *"the projectionists at each of the theaters which locked them out* [not the projectionists who struck the Coronet Theater] *stand ready and willing to man the booths."* (Italics added.)

Applying the principles of *Bodinson, Ruberoid, McKinley* and *Gardner* to the undisputed facts of the record before us, we must hold that the respondents are not entitled to unemployment insurance benefits and that the judgment of the trial court must be reversed. The "subjective volitional test" of those cases requires this conclusion. *Gardner* (53 Cal.2d 23, 29) held that the only sound and fair way to apply the subjective volitional test of *Bodinson* is to enforce it where there is a trade dispute between parties negotiating a master collective bargaining contract, each acting through authorized representatives "against the party who strikes the first blow with the drastic economic weapon of strike or lockout."

■ Respondents contend that there "was substantial evidence in the lower court that the employers did not have a multi-employer" negotiating unit. We find no such evidence that reasonably can be so construed. The record shows that the association has been representing the San Francisco theaters in labor disputes since World War II. At the outset of the negotiations here in question the association furnished the union with letters indicating such representation from all of the theaters. Respondents state that at a meeting the association declined to name the employers so represented. The record does not so indicate. The association spokesman stated that its members were the same as when the negotiations started. The files containing the names were in the union office. The parties stipulated that if called, a witness would testify that there was only one change in membership since the start of negotiations, that the union was so notified, and that theater was stricken from the list of theaters represented.

■ Respondents also urge that the letter of November 16, stating "the projectionists at each of the theaters which locked them out stand ready and willing to man the booths" operated as their disclaimer of the strike. Such an interpretation cannot reasonably be made. The letter, mentioning only the theaters which locked the projectionists out, by clear implication affirms the strike at the Coronet Theater.

■ It is also urged that the Coronet Theater strike was

"illegal" since it was not sanctioned by the international union. It does appear that no such approval was given by the parent body. But although the events of the evening of November 13 may have been violative of an agreement between the international union and the local, the fact nevertheless is that Local 162 did strike the Coronet Theater. The strike was called by the responsible, authorized and elected officials of the union for the purpose of advancing the interests of its members. It was not disclaimed by the union. Under the circumstances here respondents may not successfully contend that the Coronet Theater strike was as to them involuntary. To hold, as respondents urge, that a local union and its members are not responsible for a strike called by their elected officers because no "strike sanction" was given would tend to encourage such "illegal" strikes. A local union could thus obtain for its members all of the fruits of a strike while at the same time the members and their union would be relieved of any responsibility therefor. As stated in *Gardner* v. *State of California, supra,* 53 Cal.2d 23, 27, "the only reasonable conclusion consistent with the volitional theory, as it is accepted and applied in this state, is that the claimants were out of work after the lockout because of their own conduct *and that of their authorized unions.*" (Italics added.) (See also *General Motors Corp.* v. *California Unemp. Ins. Appeals Board,* 253 Cal.App.2d 540, 547-548 [61 Cal.Rptr. 483].)

The judgment is reversed.

Molinari, P. J., and Sims, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied April 24, 1968. Peters, J., was of the opinion that the petition should be granted.