ANDRE D. AHNNE, et al., Claimants-Appellants, Appellees *v.* DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS, STATE OF HAWAII, and QANTAS AIRWAYS, LIMITED, Appellees-Appellants

No. 5000

October 18, 1971

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND CIRCUIT JUDGE MENOR IN PLACE OF KOBAYASHI, J., ABSENT DUE TO ILLNESS

OPINION OF THE COURT BY ABE, J.

The International Association of Machinists and Aerospace Workers, AFL-CIO Local 1979, called a strike against the Qantas Airways, Ltd. on December 17, 1967 and set up picket lines. Other employees, who were not on strike, respected the picket lines and remained away from work. Of the total of 161 employees, approximately 131 of them stayed away from their jobs. During the strike period, Qantas brought in 29 employees to supplement the local staff that remained on duty. The strike lasted from December 18, 1967 to February 22, 1968.

Unemployment compensation claims were filed by 57 striking employees and 56 other employees who respected the picket lines. The claims for benefits were denied by the

Administrator of the Unemployment Insurance Division of the Dept. of Labor & Industrial Relations, State of Hawaii, and the employees appealed to the Appeal Referee. After a hearing, the referee affirmed the decision of the administrator. Subsequently, upon the motion of the employees for reopening and reconsideration of the case, a rehearing was held on September 6, 1968. After the rehearing, the referee reaffirmed his decision in denying benefits. The employees appealed to the First Circuit Court.

The case was heard on appeal by the Circuit Court on the record. The trial court, while accepting the referee's Statement of Facts, disagreed with his conclusion and held that during the strike period there was no "stoppage of work" at the establishment of Qantas. Thus, the trial court reversed the referee's decision and held that the employees were entitled to unemployment compensation. Qantas appealed from the judgment entered by the trial court.

The sole issue before us is whether during the strike there was "stoppage of work" at the "establishment or other premises" of Qantas, where the employees were last employed, within the meaning of HRS § 383-30(4) which provides as follows:

§ 383-30 *Disqualification for benefits.* An individual shall be disqualified for benefits:

\*  \*  \*  \*  \*

(4) Labor dispute. For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed; . . . .[1]

---

[1]The subsection continues:

. . . provided that this paragraph shall not apply if it is shown that:

(A) He is not participating in or directly interested in the labor dispute which caused the stoppage of work; and

(B) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of

In *Inter-Island Resorts v. Akahane*, 46 Haw. 140, 377 P.2d 715 (1962), we noted that the phrase "stoppage of work" was derived from the British National Unemployment Insurance Act of 1935, 25 Geo. V, c. 8, § 26(1). Undoubtedly, the British legislature must initially have felt that unemployment caused by a labor dispute is "voluntary" and should not be compensated. The British courts, however, quickly interpreted the phrase "stoppage of work" to refer "not to the cessation of the workman's labor, but to a stoppage of work carried on in the factory, workshop or other premises at which the workman is employed." Ministry of Labour, Analytical Guide U.I. Code 7, Part III, § 43 (1939 ed.); Brit. Ump. 1480/1927, BU-495 (1927); Brit. Ump. 609, BU-493 (1921).

Under that interpretation, even an employee who voluntarily went on strike would receive compensation, so long as the employer's business activities were not substantially curtailed. Whether or not compensation was awarded turned on the degree to which the employer's business activities were affected by the worker's unemployment. If no substantial reduction occurred, compensation was awarded; if a substantial reduction took place, compensation was denied.

That result has been defended on the ground that while compensation ought to be generally awarded, where a strike substantially reduces the employer's business activities, compensation is unnecessary because it is likely that the employer will quickly be forced to come to terms with his employees. M. I. Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, 17 U. Chi. L. Rev. 294, 308 ff. (1950). It is very unlikely that any legislature or court actually had that curious rationale in mind. Cases abound in which a dispute continues indefinitely despite a

---

whom are participating in or directly interested in the dispute; provided that, if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment or other premises.

substantial curtailment in the employer's activity. Rather, it seems more likely that the substantial curtailment requirement was a product of the British courts' unwillingness to deny compensation in every case in which a labor dispute caused employees to cease working. The courts fastened on the "stoppage of work" language to impose an additional condition which must be present before an employee is disqualified from receiving benefits. Other courts followed that interpretation, not because it adopted a sensible dividing line between cases in which benefits should be granted and cases in which benefits should be denied, but because the interpretation was a handy device to soften the harshness of the disqualification provision.

In any event, it is today perfectly clear that when the stoppage of work language was transposed from the British legislation to United States unemployment compensation acts, it carried with it the peculiar interpretation devised by the British judiciary. United States courts have almost unanimously assumed that their legislatures chose the "stoppage of work" language with the British interpretation of the phrase in mind. *See Totorica v. Western Equipment Co.*, 401 P.2d 817 (Idaho 1965); *Fontaine v. Board of Review of Dept. of Emp. Sec.*, 210 A.2d 867 (R.I. 1965); *Monsanto Chemical Co. v. Thornbrough*, 314 S.W.2d 493 (Ark. 1958); *Bilodeau v. Maine Employment Sec. Comm.*, 136 A.2d 522 (Me. 1957).

Accordingly, in *Inter-Island Resorts v. Akahane*, 46 Haw. 140, 148, 377 P.2d 715, 720 (1962) and in *Meadow Gold Dairies v. Wiig*, 50 Haw. 225, 227-28, 437 P.2d 317, 319 (1968), we held that the phrase "stoppage of work" means a "substantial curtailment of the business activities at the employer's establishment rather than unemployment on the part of the striking employee."

In this case, therefore, the applicants will be disqualified from receiving benefits only if it is determined that a "substantial curtailment" of business activity occurred at their employer's "establishment." In the determination of this

question, it is necessary for us to decide what is the "establishment" or "establishments" of Qantas involved here.

Other courts have had occasion to determine and define "establishments" of employers in connection with claims for unemployment benefits involving strikes. Most decisions define "establishment" by examining one or more factors, hereinafter discussed, which link an employee to the unit in which he works.[2] An occasional court has given special emphasis to the "functional integration" of interrelated plants, and grouped separate locations into a single establishment, but that approach has been generally rejected.[3] The factor most courts emphasize in determining when employees occupy distinct establishments is the physical location where the employees work. Employees working in a separate geographical situs are classified into a separate establishment.[4]

No particular policy justifies greater or lesser emphasis on either of these factors. The different approaches are generally defended in accordance with the policy to expand or contract the labor dispute disqualification.[5]

California cases adopt a unique "volitional test" which in effect groups employees into the same establishment, even though they occupy distant premises, if it appears that

[2]See Nordling v. Ford Motor Co., 231 Minn. 68, 42 N.W.2d 576 (1950); Park v. Appeal Bd. of Michigan Emp. Sec. Comm. 355 Mich. 103, 94 N.W.2d 407 (1959); General Motors Corp. v. Review Bd. of Indiana Emp. Sec. Div., 255 N.E.2d 107 (App. Ct. Ind. 1970); McAnallan v. Michigan Emp. Sec. Comm., 26 Mich. App. 621, 182 N.W.2d 753, 757 (1970).

[3]Abnie v. Ford Motor Co., 175 O. St. 273, 194 N.E.2d 136 (1963); Nordling v. Ford Motor Co., 231 Minn. 68, 42 N.W.2d 576 (1950).

[4]See Nordling v. Ford Motor Co., 231 Minn. 68, 42 N.W.2d 576 (1950); Ford Motor Co. v. New Jersey Dept. of Labor & Indus., 5 N.J. 494, 76 A.2d 256 (1950); In re Ferrara's Claim, 217 N.Y.S.2d 11, 10 N.Y.2d 1, 176 N.E.2d 43 (1961); Abnie v. Ford Motor Co., 175 O. St. 273, 194 N.E.2d 136 (1963).

[5]See, e.g., Comment, *Unemployment Compensation: Labor Dispute Disqualification—The Implications of the Word "Establishment,"* 1964 U. Ill. L. Forum 815, 817 nn. (1964). In the usual case that arises, an employee argues that while a work stoppage existed in his establishment, it occurred because of a labor dispute in another establishment. Seeking to liberally award compensation, courts tend to construe each separate physical place of business to be a distinct establishment.

each group shares responsibility for the existence of the labor dispute. *Gardner v. State Director of Employment,* 53 Cal.2d 23, 346 P.2d 193 (1959); *Caldwell v. Bruning,* 64 Cal.2d 111, 48 Cal. Rptr. 849, 410 P.2d 353 (1966); *Artigues v. California Dept. of Employment,* 259 Cal. App. 2d 409, 66 Cal. Rptr. 390 (1st Dist. 1968). While the California approach may have surface appeal, it drains all meaning from the term "establishment." Two employees working in a single room would be classified into different establishments if one did not consent to the strike, and employees on opposite sides of the earth would be held to share an establishment if they assented to each other's disputes.[6]

Our task is to consider as realistically as possible the size of the actual unit in which an employee functions. We believe that the word "establishment" should be given its natural meaning. It can refer to a building or group of proximate buildings, but, generally speaking, it should not refer to locations many miles apart.

Here, we hold that Qantas' Hawaii activities are conducted in two separate establishments, its Waikiki ticket office and its airport operations. The factor most strongly indicating this result is the geographical distance separating the two facilities. However, even if "functional integration" were given greater emphasis, the two locations would fall naturally into distinct functional units. The Waikiki ticket office issues tickets, makes reservations and the like. The airport facility is involved in a variety of coordinated activities. At the ticket counter Qantas employees issue tickets and information to passengers, receive their baggage, and route the bags to appropriate personnel who load the planes.

---

[6]Under the Hawaii statutory scheme, the voluntariness of a worker's unemployment *is* of importance, for the proviso of § 383-30(4)(A) and (B) states that even a worker in an establishment in which a labor dispute has caused a stoppage of work may still receive compensation if neither he nor a "grade or class" to which he belongs is one participating in or directly interested in the disputes.

However, while "voluntariness" is important under the proviso, it should not be used to muddle the determination of what constitutes "establishment."

Meanwhile, other personnel functioning within the airport facility are refueling planes, restocking the galleys, and making any necessary mechanical adjustments. The entire airport operation constitutes an establishment distinctly separate functionally and geographically from the Waikiki ticket office.[7]

Once we have defined the boundaries of the establishment or establishments in question, we must determine whether in any establishment, a substantial curtailment of business activity occurred during the strike period. We believe that the slight curtailment of Qantas' business activities at the airport cannot be termed "substantial." The essential function of the airport establishment was to facilitate the passage of planes in and out of Honolulu for the objective of transporting passengers and cargo. Throughout the strike period, little reduction occurred in that activity. Planes continued to arrive and depart from Honolulu with only a slight decrease in the number of flights. The number of passengers served by the Honolulu establishment during the strike period actually increased.[8] The trial court found that total revenues derived from the airport establishment

---

[7] It should be noted parenthetically that although we hold that the Waikiki ticket office and airport facilities each constitute a distinct situs, compensation would be awarded to the appellees in this case even if the two facilities were lumped together and considered as a single establishment. Then, even if the Honolulu operations were considered in the aggregate, we would agree with the trial court that, because Qantas' basic business activity of flying airplanes, passengers, and cargo in and out of Honolulu continued relatively unabated, no substantial curtailment of activity existed.

[8] The record shows the following passenger load:

|  | Strike Period | Comparable Period |
|---|---|---|
| Number of passengers from Honolulu | 3,274 | 3,006 |
| Number of passengers through Honolulu | 5,502 | 4,387 |
| Total | 8,776 | 7,393 |

decreased by a mere 4 per cent.[9] It is true, as appellant points out, that isolated activities such as ticket sales and ground services provided other airlines were reduced dramatically.[10] However, the record shows that there was no substantial curtailment of the overall business activities at the airport establishment. The airport employees are therefore not disqualified from receiving compensation.

The factual situation at Qantas' Waikiki ticket office is different. Unlike the airport facility which performed·many functions, the Waikiki establishment was devoted solely to issuing tickets and. making reservations for customers. Virtually no ticket sales were made during the strike period. Clearly a substantial reduction of the activities had occurred.

However, the disqualification of § 383-30(4) requires more than a "stoppage of work." There must also be a labor dispute at the establishment in question, and a labor

---

[9]The record shows the following revenues:

|  | Strike Period | Comparable Period |
|---|---|---|
| Passenger load to and from Honolulu* | $1,103,600 | $1,054,700 |
| Cargo | nil | 17,800 |
| From services (aircraft belonging to other airlines) | 69,500 | 158,700 |
| Total | $1,173,100 | $1,231,200 |

*Equals ½ of total revenue, based on passenger load at economy fare rates. The fare revenue represents air transportation cost between two points (Honolulu to Australia, etc.), and thus only ½ of revenue allocated to Honolulu.

[10]The appeal referee concluded that though "flying passengers and cargo is employer's principal business . . . the activities of employer in Hawaii are ground oriented not only to its own aircrafts but to those of other airline companies, and, even though normalcy in flights and passenger loads were most important to employer, it meant only in the present case that the part of the activity here dealing with that phase of work continued." The referee determined Qantas' Hawaii "establishment" business activities to consist of what he termed the "actual" activities performed in Hawaii—selling tickets, servicing its own aircraft and passengers; and servicing aircraft belonging to other airlines. Of these activities, the record showed substantial reduction in sales of tickets and substantial reduction in revenue received from servicing aircraft belonging to other airlines during the strike period. Thus the referee concluded there was "work stoppage" and the employees were not entitled to benefits.

dispute at one establishment will not bar compensation of employees at a different establishment. *Northwest Airlines, Inc. v. Michigan Emp. Sec. App. Bd.*, 378 Mich. 119, 142 N.W.2d 649 (1966); *In re Ferrara's Claim*, 10 N.Y. 2d 1, 217 N.Y.S.2d 11, 176 N.E.2d 43 (1961); *Nordling v. Ford Motor Co.*, 231 Minn. 68, 76, 42 N.W.2d 576, 581 (1950); *McAnallen v. Michigan Emp. Sec. Comm.*, 26 Mich. App. 621, 182 N.W.2d 753 (1970).

Thus, even if a "stoppage of work" did exist at Qantas' Waikiki office, the issue is whether that stoppage was a result of a labor dispute at that establishment. As defined in *Inter-Island Resorts*, the term "labor dispute" means "any controversy concerning wages, hours or other terms or conditions of employment, or concerning the association or representation or persons in negotiating, fixing, maintaining, changing or seeking to arrange wages, hours or other terms or conditions of employment." 46 Haw. at 146, n. 4. In this case there was no such controversy between the Waikiki ticket agents and Qantas. Those agents sought nothing, and stood to gain nothing. The labor dispute was not at Waikiki but at the airport. The disqualification of § 383-30(4) is therefore inapplicable.

Affirmed.

*Peter A. Donahoe* and *John A. Hoskins* (*Anthony & Waddoups* of counsel) for appellee-appellant.

*Benjamin C. Sigal* (*Shim, Sigal & Ono*) for claimants-appellants-appellees.